THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOEL STEINBERG, Also Known as JOEL BARNET STEINBERG, Appellant.

First Department, August 8, 1991

54

**APPEARANCES OF COUNSEL**

*Perry S. Reich* of counsel *(Steven M. Schapiro* and *Mel Sirkin* with him on the brief; *Schapiro & Reich,* attorneys), for appellant.

*Mark Dwyer* of counsel *(Patricia Curran, Alan Gadlin, Paula Milazzo* and *Donald J. Siewert* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

**OPINION OF THE COURT**

Sullivan, J. P.

During the afternoon of November 1, 1987, defendant was at home in apartment 3W at 14 W. 10th Street with his six-year-old "adopted" daughter, Lisa Steinberg, his live-in companion of over 10 years, Hedda Nussbaum, and his other "adopted" child, Mitchell, a 16-month-old boy. There was no evidence that either child had ever been legally adopted. Defendant had earlier expressed annoyance with Lisa for not drinking enough water and warned her that he would not take her with him to a dinner engagement unless she obeyed him.

At approximately 6:00 P.M., Lisa, at Nussbaum's suggestion, went into the bedroom to ask defendant if he would take her with him. Moments later, defendant carried Lisa's limp body out to Nussbaum, who was in the bathroom. Lisa, who had been fully clothed and was now wearing only underpants, was unconscious. Nussbaum had not heard any noises after Lisa had entered the bedroom. In response to Nussbaum's inquiry, defendant replied, "What's the difference what happened. This is your child. Hasn't this gone far enough?" Nussbaum had no idea what defendant meant by this remark. Defendant handed Lisa to Nussbaum, who placed her on the bathroom floor. Lisa's eyes were closed, she was unresponsive and she was not moving at all. Her breathing was raspy.

During the next hour, while defendant dressed to go to dinner, Nussbaum tried to revive Lisa by pressing down on her back in the lung area so as to pump her chest. When defendant left the apartment at 7:00 P.M., he reassured Nussbaum that he would "get [Lisa] up when [he] g[o]t back." Nussbaum, who had come to believe that defendant had many "god-like powers", including healing and extrasensory perception, expected that he would get Lisa up when he returned.

Lisa's condition did not change during the three hours in which defendant was absent from the apartment. Nussbaum considered calling 911, but was afraid that defendant would consider it a sign of "disloyalty". As Nussbaum testified, defendant "was always making a big deal * * * that I should be loyal to him." Nussbaum herself had on her leg 5- or 6-day-old, badly infected ulcers, which were painful and oozing pus, causing her to limp. She had not sought medical attention because defendant had promised to heal her.

At 10:00 P.M., defendant returned to the apartment, asked

for a file relating to his oil well investments and went back outside to show the file to the client with whom he had dinner. About five minutes later, defendant returned to the apartment. As he looked at Lisa, Nussbaum anxiously urged him to "get her up." Defendant refused with the comment, "[N]o, we have to be relating when she wakes up." Then, referring to freebasing cocaine, he said, "[L]et's smoke." Nussbaum located the last cocaine left in the house and prepared it. Defendant smoked for a "number of hours" until the cocaine was finished. Nussbaum, whose leg was bothering her, had only one or two puffs. As they smoked, defendant referred to the bedroom incident, stating, "I knocked her down and she didn't want to get up again. This staring business has gotten to be too much for her."

On several occasions that night, Nussbaum suggested to defendant that they "get Lisa up." Defendant promised that he would. Finally, at approximately 4:00 A.M., upon Nussbaum's urgings, defendant picked up Lisa's limp body from the bathroom floor and placed her on their bed. Defendant sat with his arm resting on Lisa, whose breathing then sounded better. He did nothing else to aid her. Defendant then said that he was going to sleep. Nussbaum said she would sit up and watch Lisa. Instead of sleeping, defendant talked.

At approximately 6:00 A.M. Nussbaum went to the bathroom. "Sounding frantic," defendant called to her and she ran back to the bedroom. Defendant said, "[S]he stopped breathing." Defendant was trying to revive Lisa by "pushing at her back" and "giving her some breaths." Nussbaum asked if she should call 911. Defendant said, "[N]o, give me a chance first to do something." He continued with his "frantic movements." When Nussbaum asked, several minutes later, if she could help, defendant told her to call 911. She did. Defendant, who had already started to perform mouth-to-mouth resuscitation, followed the 911 operator's instructions as to the correct technique.

The police and paramedics arrived at apartment 3W at about 6:40 A.M. and promptly administered oxygen to Lisa. A Heimlich maneuver was performed to remove an obstruction, which turned out to be a teaspoonful of partially digested food, apparently vegetables. When Lisa failed to breathe on her own after the obstruction was removed, it suggested to the paramedics that she had been unconscious even before she had started vomiting, contrary to defendant's explanation that she had choked on vegetables she had been eating. The

paramedics then decided to bring Lisa to the pediatric emergency room of St. Vincent's Hospital, where numerous medical personnel attended to her. They placed a tube through her mouth into her trachea to insure that air would go directly into her lungs. The medical personnel observed that Lisa's body was covered with bruises in various stages of discoloration, some as recent as 1 or 2 days old; others were a week or more old. Both arms and legs contained multiple bruises. There were at least eight brownish-green bruises on her left leg, on the knee, below her knees, and on the inner part of her thigh, and three multicolor bruises on her right leg. One bruise below Lisa's left knee was red with a brown border indicating that she had been injured there on several occasions.

In addition, there were multiple, yellow to yellow-brown colored bruises on Lisa's chest, a red bruise on her right side and a black and blue bruise on her left buttock. There were also three bruises on Lisa's back over her left shoulder blade, one of which, since it was red, appeared to have been incurred within the last 24 hours; the other bruises were greenish-brown. There was a scratch mark on Lisa's right shoulder blade. There were at least four brown-blue bruises in the lumbo-sacral area. These bruises were considered particularly significant since it is almost impossible for a child to injure himself or herself in that area. In addition to the multiple bruises, Lisa was in a "state of poor hygiene." Her hair was heavily matted and tangled. A two-inch chunk of hair was either cut or pulled out near the back of her neck. Her toenails were dirty and her feet, which had "six layers of dirt" on the soles, were "filthy". Some of the dirt, which appeared to go up to her ankles, was scaling. There was an "extensive amount" of dirt in her fingernails. Her body smelled of urine and vomit. At trial, an expert in pediatrics and child abuse testified, concluding, on the basis of her review of Lisa's medical records, the autopsy report, pictures of Lisa at the hospital and defendant's apartment, that Lisa suffered from battered child syndrome.

Within minutes after Lisa was brought into the emergency room, a neurological examination was performed, on the basis of which the neurological resident, Dr. Kilhenny, concluded that her brain was severely swollen and pressing down on the brain stem and that the swelling was caused by a subdural hematoma located near a bruise on the right side of Lisa's forehead, below her hairline and extending into her hair. The

bruise was red, indicating that it was recently sustained. Dr. Kilhenny noted periooptic ecchymosis, or bruises around both eyes and commonly referred to as "raccoon eyes", a condition that can be caused by a sphenoid bone fracture, which causes bleeding into the sinuses and is indicative of serious head trauma. Dr. Kilhenny concluded that blunt trauma was the cause of the hematoma.

Defendant's explanation at the time was that Lisa had complained of a stomach ache and had been put to bed after dinner. According to defendant, Lisa woke him and Nussbaum at about midnight. She was taken to the bathroom, where she vomited. Believing she was all right, defendant put her back to bed. Defendant heard Lisa vomiting a little while later but did nothing because he believed she was all right. When he and Nussbaum went to Lisa's room sometime around 6:00 A.M., they found she had vomited again, was having difficulty breathing and was making coarse breath sounds.

When Dr. Kilhenny advised defendant that although Lisa might survive she had severe brain damage, which was irreversible, and that she would have "permanent neurological deficits", he responded, "Well, she is not going to be an Olympic athlete, but she will survive." At another point, when a police officer asked defendant what had happened to his hand, which appeared to be bruised, he nervously responded, "I don't know, I don't know that I had this." After defendant left the hospital, Dr. Kilhenny, strongly suspicious of child abuse since his clinical findings were consistent with head trauma and did not "jibe" with the history given by defendant, called the police.

A CAT scan confirmed the severe trauma and brain swelling, but gave no indication of bone fracture. It also showed that the usual spaces around the brain stem were completely obliterated, suggesting that there was pressure pushing the brain down into the hole at the base of the skull through which the spinal column attaches. There was also evidence of tissue damage within the brain due to lack of oxygen. Lisa was in a deep coma; she had lost all cognitive and voluntary functions, including the ability to breath spontaneously. Only brain stem and spinal cord reflexes were present. The loss of respiratory function suggested that the pressure had pushed the brain stem down into the bones of the spinal column. Over the course of the next few days, Lisa's condition did not improve. Readings from an intracranial monitor which had been inserted into Lisa's head indicated a severe increase in

intracranial pressure and that Lisa was not responding to medical treatment. An EEG reading taken on November 3rd and another on the 4th were both "flat". Neurological examinations showed that Lisa met the criteria for brain death. On November 5th, at 8:40 A.M., the doctors removed the life support system. Her heart stopped at 8:55 A.M.

A postmortem examination confirmed that the cause of death was a subdural hematoma sustained as a result of blunt trauma to the head. Three head bruises were noted, one on the right temple near the hairline over Lisa's eye, another on her scalp directly in the center of the back of her head and a third, which had been covered by surgical tape, on the left cheek, midway between chin and ear. According to the medical evidence, the extent of the injuries to Lisa, who was 3-feet 10-inches tall and weighed 43 pounds, indicated that "tremendous" force, equivalent to a fall from a tall flight of stairs or third-story window and consistent with a blow from a 6-foot tall, 180-pound man hitting her in the right frontal area, had been applied to her head, causing her to fall and hit the back of her head. Similarly, a blow to Lisa's jaw or to the back of her head could have caused the injuries. Indeed, if the force were sufficient, one blow to the jaw, back of the head or forehead could have caused the injuries. Of the three bruises found on Lisa's head, none was more significant than the other; any one of them or combination of them was sufficient to cause death.

It was estimated that Lisa's brain had stopped functioning somewhere between the late afternoon of November 2 and 8:30 A.M. on November 3. A neuropathologist who examined Lisa's brain estimated that the injury to her brain occurred sometime between 4:30 P.M. on November 1 and 8:30 A.M. on November 2. The associate medical examiner concluded that the injury to her brain was not consistent with a child's vomiting and breathing in some of the vomitus, since aspiration cannot cause a subdural hematoma. Moreover, Lisa's lungs were clear. According to both the associate medical examiner and neuropathologist, vomiting is consistent with a head trauma and, in this case, was a symptom of Lisa's injuries.

The evidence also showed that despite the extent of Lisa's injuries, prompt medical intervention could have prevented her death. Even though Lisa, after suffering a blunt trauma, had fallen unconscious and then lapsed into a coma, the process could have been reversed. A subdural hematoma could

have been removed by drilling a small hole at the site and suctioning off the blood, which would have relieved the pressure and prevented further herniation. The swelling inside the brain could have been alleviated by drug therapy, to which children favorably respond.

On the morning of November 2, 1987, after Lisa had been taken to the hospital, two officers, at the request of hospital personnel, returned to defendant's apartment to obtain a sample of the vegetables on which Lisa had allegedly choked. The officers found Mitchell, the 16-month-old boy, in a playpen to which he was tethered by a rope, drinking milk that appeared to be sour. The officers reported their findings to the Bureau of Child Welfare and to two detectives from the Manhattan Sex Crimes Unit, which handled cases of suspected child abuse. After speaking to Lisa's doctors, the two detectives proceeded to apartment 3W, to which defendant had himself returned at about 8:30 A.M. The apartment was dirty and extremely cluttered. Broken telephones, clothing and boxes were piled on tables and on the floor. "[T]hings [were] strewn around the place." The apartment had a musty odor. There was a smell of stale urine. Mitchell, dirty and smelling of urine, was found lying in the playpen, which was makeshift, without a bottom and only a thin, dirty mattress underneath it. When asked where Lisa slept, defendant pointed to a dirty couch in the living room. In response to a similar question as to Mitchell, defendant replied that he slept in the playpen. Mitchell was removed to the station house.

Later that same day, defendant and Nussbaum were taken to the station house, where they were separately interviewed. She told the detective that defendant had not been home when she fed Lisa dinner. Lisa had started to vomit and her breathing became irregular. After defendant returned to the apartment, they both stayed up with Lisa throughout the night until 6:00 A.M., when defendant called her back to the bedroom and told her that Lisa had stopped breathing. The bruises on Lisa's body, Nussbaum stated, were caused by falls taken during rollerskating. Lisa also suffered bruises on her head as a result of being struck by a classmate a few days before. These responses, as Nussbaum subsequently acknowledged, were a "cover story" for defendant, whom she assumed was responsible for the bruises. She lied, as she was to testify later, because she wanted to "protect" defendant. Asked about her own bruises, Nussbaum explained that she had fallen. Nussbaum had blackened and swollen eyes, bruises under the

eyes and nose and lips that were inflamed and split down the middle. Her nose was flat with a split down the center. Chunks of her hair were missing and she had several cuts on the back of her head. Nussbaum, about 5-feet 3-inches tall and weighing about 130 pounds, spoke and moved slowly. She also limped, was hunched over and appeared unable to stand erect. While her fingers and knuckles were disfigured, no fresh cuts or bruises were observed.

When defendant was interviewed, it was observed that all of his knuckles appeared red and swollen. There were also scratches, which appeared to be fresh, on the top joints of both forefingers and thumbs. When a sergeant, in defendant's presence, asked a technician from the District Attorney's office to videotape defendant's nails and hands, defendant began biting the nails on both hands and "cleaning them out". While taping the fingernail scraping of defendant's hands, the technician noticed that his hands were red and bruised; the nails were short and appeared to have been bitten. At about 9:00 P.M. that evening, both defendant and Nussbaum were booked and charged in connection with Lisa's injuries.

On November 3rd, after complaining of leg pain, Nussbaum was taken to Bellevue Hospital and examined. An X ray showed a "minimally displaced" fracture of the nasal bone which, given the lack of any indication of healing, could have been recently sustained. An X ray also revealed two fractures of her cheekbones, at least 3 to 4 months old, one on either side of the face. X rays also showed the existence of several rib fractures sustained at least 4 to 5 months before. The presence of a black-and-blue mark under her right eye and a split lip were also noted. The purple discoloration of a large black-and-blue mark on the right buttock was suggestive of a three-day-old injury. An ulcer over the bridge of her nose was discharging pus. There were old, healed lacerations on the left side of the scalp as well as a recent abrasion on the right side of the skull. Nussbaum was also found to have two ulcers, 3 to 4 centimeters in diameter, on her right leg, both of which emitted a "malodorous" discharge of pus. The leg was swollen to the knee. She also suffered from a "months" old skin infection, "most likely" secondary to the ulcers, which, if not treated, was potentially fatal.

The wounds to Nussbaum's head, face, abdomen, buttock and leg were "consistent" with trauma injuries. She was also found to be anemic and chronically debilitated as well as

malnourished, all of which, according to the examining physician, were symptomatic of drug abuse.

After leaving Bellevue Hospital, Nussbaum was eventually admitted, in late November, to the psychiatric unit at Columbia Presbyterian Hospital, where she underwent therapy. In March 1988, she was transferred to a psychiatric hospital in Katonah, New York, where she spent approximately five hours a day in therapy and still resided at the time of trial. Nussbaum's psychiatric treatment was instrumental in changing her perception of herself and of defendant and, on July 7, 1988, while represented by counsel, she signed a written cooperation agreement with the District Attorney. The agreement acknowledged that the investigation to that point had not disclosed any credible evidence that Nussbaum had affirmatively caused any injury to Lisa such as to lead to her death; nor had she aided anyone else in doing so. If such evidence were developed, the agreement would be rendered void. If none were developed, Nussbaum could not be prosecuted. She was obligated to assist in the investigation and, if requested, to testify truthfully at any trial. In all, Nussbaum spent over 100 hours in meetings with members of the District Attorney's staff. In October 1988, the charges against her were dropped.

Indicted for murder in˜ the second degree, manslaughter in the first degree and related offenses, defendant proceeded to trial and was acquitted of murder but convicted of manslaughter in the first degree. After sentence, he moved, pursuant to CPL 440.10, to set aside the judgment, alleging, *inter alia,* prosecutorial misconduct based on the prosecutors' failure to take notes of their interviews with Nussbaum. The motion was denied. Both the judgment of conviction and order denying the postjudgment motion are appealed, the latter by leave of a Justice of this court. Defendant raises numerous claims, many of which are not preserved for appellate review and not all of which warrant discussion.

■ Viewing the evidence, as we must, in the light most favorable to the People *(People v Contes,* 60 NY2d 620, 621), and applying the required strict scrutiny standard in a case such as this, based upon circumstantial evidence *(People v Way,* 59 NY2d 361, 365), we find that defendant's guilt of manslaughter in the first degree was proven beyond a reasonable doubt. The People's theory of manslaughter in the first degree, as charged by the court, was that defendant, with intent to cause serious physical injury to Lisa, injured her and

then failed to obtain medical assistance for her, causing her death. Under the court's charge, the People were required to prove both the act of commission and omission and the requisite *mens rea*—intent to cause serious physical injury— with respect to each. Defendant argues that while a father's failure to provide medical assistance to his child may be the basis of a prosecution for reckless or negligent homicide it cannot, as a matter of law, support a charge of intentional homicide since a crime based in part on an omission to act cannot be intentional. Defendant thus contends he was convicted of a nonexistent crime. This claim is meritless.

The Penal Law specifically provides that criminal responsibility may be based on an omission, defined as a "failure to perform an act as to which a duty of performance is imposed by law." (Penal Law § 15.00 [3]; *see,* § 15.10.) An omission may be the predicate for a homicide conviction. *(Matter of Eichner,* 73 AD2d 431, 450, *mod on other grounds* 52 NY2d 363, *cert denied sub nom. Storar v Storar,* 454 US 858.) In addition, the Penal Law recognizes that one may, by an omission, act intentionally; it provides that a "person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct" (Penal Law § 15.05 [1]) and defines the term "conduct" to include an act or omission (§ 15.00 [4]). In New York, parents have a "nondelegable affirmative duty" to provide adequate medical care to their children. *(Matter of Hofbauer,* 47 NY2d 648, 654-655; *see,* Family Ct Act § 1012 [f] [i] [A]; *see also,* Penal Law § 260.10 [2].) When a child dies because of a parent's failure to fulfill that duty, the parent is held accountable for the homicide. *(See, People v Henson,* 33 NY2d 63.) It follows that the failure of a parent to provide such care can serve as the predicate for a homicide charge that requires as the culpable mental state an intentional act.

■ Moreover, manslaughter in the first degree is defined, not in terms of prohibited conduct but, rather, of a result caused, accompanied by a culpable mental state. *(See,* Penal Law § 125.20.) When a crime is so defined, "[t]he emphasis is upon results caused by the defendant, and any act or omission (with the prescribed state of mind) which causes that result will do." (1 LaFave and Scott, Substantive Criminal Law § 3.11 [c], at 382 [1986].) Thus, contrary to defendant's argument, the crime of which he was convicted is "defined in the Penal Law" and is not nonexistent.

Nor do the cases cited by defendant support his claim that recklessness and negligence are the only mental states applicable to crimes of omission. While *People v Flayhart* (72 NY2d 737) and *People v Henson (supra)* involved prosecutions for reckless manslaughter and criminally negligent homicide, based on a failure to provide medical care, in no way do they prohibit prosecutions for intentional crimes based on such omission. We are unaware of any New York case barring a prosecution for intentional homicide based on a failure to act. Indeed, in several out-of-State cases, parents have been convicted of intentional murder for the deaths of their children due to malnutrition and dehydration. *(Harrington v State,* 547 SW2d 616, 619 [Tex Crim App 1977] ["The omission or neglect to perform a duty resulting in death, such as of a mother failing to feed her child, may constitute murder where the omission was willful and there was a deliberate intent to cause death"]; *see, Lewis v State,* 255 Ga 101, 335 SE2d 560 [1985]; *Zessman v State,* 94 Nev 28, 573 P2d 1174, 1178 [1978]; *see also, State v Evangelista,* 319 NC 152, 353 SE2d 375, 379-381 [1987].)

In that regard, *De Leon v State* (684 SW2d 774 [Tex Ct App 1984]) is significant in light of the specific omission with which the defendant was charged, i.e., the failure to provide necessary medical care and food to a child. A murder conviction for such failure was upheld because "[t]he omission by a parent to perform his statutory parental duty which results in the death of the child, if done intentionally and knowingly, is murder." *(Supra,* at 776.) Similarly, in *State v House* (260 Ore 138, 489 P2d 381, 384 [1971]), an indictment charging the "deliberate and premeditated" murder of a child resulting from the parent's failure to provide medical care and sustenance was reinstated as sufficient to sustain a murder charge.

In any event, the manslaughter charge here was based not only on defendant's omission but also on his acts of commission in injuring Lisa. And, certainly, there is nothing improper in combining both acts of commission and omission as the basis of an intentional manslaughter charge, especially since, as already noted, the offense is defined, not in terms of proscribed conduct, but in the result and an accompanying mental state. Nor need the conduct be limited to a single act or omission. Just as two acts of commission, the stabbing and bludgeoning of a victim, could be the basis of a single charge of intentional manslaughter, so could the infliction of an injury compounded by a willful failure to discharge a duty to

obtain treatment for that injury. Thus, there is no reason why acts of commission and omission activated by the same mental state and constituting a crime cannot serve as the factual basis for a single charge of that crime. In *State v Parmenter* (74 Wash 2d 343, 444 P2d 680 [1968]), the defendant foster parents were convicted after a charge that allowed the jury to consider their assault of the child, their failure to provide medical treatment for the resultant injuries, or both. *(Supra,* 444 P2d, at 686-687, n 1.) The court found the evidence sufficient under any of the three theories and that the trial court properly refused to compel the prosecutor to elect one of them. *(Supra,* 444 P2d, at 685-686; *see, State v Crocker,* 435 A2d 58, 62, 68, 76-77 [Me 1981].)

■ Furthermore, contrary to defendant's claim, the evidence was sufficient to support the conviction of manslaughter in the first degree. A verdict is supported by sufficient evidence as long as "there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence * * * and as a matter of law satisfy the proof and burden requirements for every element of the crime charged." *(People v Bleakley,* 69 NY2d 490, 495.) That competing inferences could be drawn from the evidence does not render the proof of guilt insufficient. "A choice between competing inferences, as a choice between competing facts, is available to the trier of facts [as] long as the one arrived at is found beyond a reasonable doubt." *(People v Castillo,* 47 NY2d 270, 277.)

Since this conviction is based entirely on circumstantial evidence, our task is to determine whether the conclusion of guilt is consistent with and flows naturally from the proven facts, which, viewed as a whole, must exclude every hypothesis but that of guilt to a moral certainty. *(People v Kennedy,* 47 NY2d 196, 202; *People v Benzinger,* 36 NY2d 29, 32.) The sufficiency of circumstantial evidence is, "[i]n the end", resolved by determining "whether common human experience would lead a reasonable [person], putting his [or her] mind to it, to reject or accept the inferences asserted for the established facts." *(People v Wachowicz,* 22 NY2d 369, 372.) Of course, the reviewing court must view the evidence in the light most favorable to the People, proceeding on the assumption that the fact finder credited the People's witnesses and accorded their evidence the full weight that might reasonably be given it. *(See, People v Kennedy, supra,* at 203; *People v Benzinger, supra,* at 32.)

Review of the record reveals that the only reasonable conclusion was the one that even defendant's own expert reached, i.e., that Lisa's death was a homicide, resulting from child abuse. Not suprisingly, defendant has abandoned his attempts to attribute Lisa's death to some innocent cause. The record also yields powerful evidence that it was defendant who was responsible for Lisa's death.

The evidence established that defendant had abused Lisa on previous occasions. Nussbaum had, several times in October 1987, observed him grab Lisa by the arms, shake her and throw her to the ground. On October 23, 1987, his client, Scannapieco, observed him hit Lisa in the face hard enough normally to "bring tears to [anyone's] eyes." The clothes defendant was wearing on that fateful November 2, 1987 when the police and paramedics arrived at his apartment were examined for human hairs. A number of the recovered hairs, all of which had been forcibly removed, matched Lisa's hair characteristics. At least one of the hairs was found "entangled" in the fibers of defendant's shirt, which, according to the testimony, could occur only as a result of "some type of struggle." Nussbaum also recalled that in October 1987, defendant told Lisa that if asked about her bruises, she should blame them on Mitchell, and also instructed Nussbaum to dress Lisa in long sleeves until the bruises healed. When, on October 24, 1987, Scannapieco's sister noticed a bruise over Lisa's eye, Lisa blamed her little brother while defendant claimed that Mitchell was constantly doing things like that. A teacher, on October 30, 1987, asked Lisa about a bruise under her eye; she again blamed Mitchell.

Moreover, the evidence established beyond a reasonable doubt that it was defendant who struck the fatal blow. Nussbaum, who specifically denied ever having struck Lisa on the night in question, testified that at around 6:00 P.M., moments after Lisa went into the bedroom to ask whether defendant would be taking her to dinner, defendant carried Lisa's limp body out to her. Since defendant was alone with Lisa when she suffered the injury that rendered her unconscious, the only rational conclusion is that it was he who inflicted the blow. *(See, People v Morales,* 118 AD2d 663.) Defendant's remark to Nussbaum at the time confirmed that fact. Further, later that night, defendant conceded that he had "knocked [Lisa] down".

In addition, the expert medical testimony supports the jury's finding that defendant inflicted the blow to Lisa's head

which ultimately resulted in her death. The People's medical experts concluded that defendant's repeated accounts that Lisa had been vomiting all night and stopped breathing when she choked on her vomit were inconsistent with the objective evidence. They uniformly found that Lisa's brain swelling was due to a subdural hematoma, inflicted as a result of a blunt trauma caused by at least one weighty blow to her head or face. The doctors who testified for the People concluded, as did defendant's expert, that the blunt trauma could not have been caused by an ordinary fall or some undetermined blow from another child. And, in view of the force required to inflict such an injury, it was far more likely that defendant committed the acts than Nussbaum. In that regard the doctors testified that the blow that caused the subdural hematoma had to be delivered with a considerable amount of force. As the record indicates, a man approximately 6-feet tall and weighing 180 pounds, which was defendant's height and weight, could generate enough strength to inflict such an injury. In contrast, Nussbaum, 5-feet 3-inches to 5-feet 5-inches tall and weighing 125 to 130 pounds and in such a debilitated physical condition that one paramedic thought she was 70 or 80 years old, was highly unlikely to have had the strength to do so. This coupled with the medical evidence regarding Nussbaum's extensive injuries suggested that she was both physically and psychologically incapable of inflicting such an injury.

Moreover, other evidence tended to prove that defendant committed the brutal acts causing Lisa's injuries. He was observed, just minutes after Lisa was brought to the hospital, with two small fresh cuts on a knuckle on his right hand. The last two knuckles on the hand were red and bruised. In addition, defendant had scratches, which appeared fresh, on several fingers. When Nussbaum's hands were examined, no bruises or cuts were observed. In addition, the jury was entitled to conclude that defendant's patently false explanations about the nature and cause of Lisa's grave condition and the various bruises on her body, designed to shift the blame away from him, displayed a consciousness of guilt on his part. *(See, People v Engler,* 150 AD2d 827, 830, *lv denied* 75 NY2d 770; *People v Sims,* 110 AD2d 214, 223-224.) While, "as a general proposition", false statements are a weak form of evidence *(People v Benzinger, supra,* 36 NY2d, at 33), these statements do not stand alone but, rather, are "a part of a framework of evidence from which an inference of guilt may reasonably be drawn." *(People v Sims, supra,* at 224.) Defen-

dant's attempt to destroy potential evidence—biting his finger-nails, "cleaning them out" and then swallowing whatever he had discovered after overhearing a request to videotape his hands and nails—is also part of that framework.

■ Thus, contrary to defendant's argument, there was an abundance of proof completely independent of the testimony of Nussbaum, who, the court charged, was an accomplice as a matter of law, that defendant was the one who injured Lisa. Accordingly, her testimony was sufficiently corroborated by evidence "tending to connect the defendant with the commis-sion of [the] offense" to satisfy CPL 60.22 (1). False statements can themselves be sufficient corroboration as long as there is "some nexus between the defendant and the criminal activity apart from the bare evidence of consciousness of guilt." (People v Moses, 63 NY2d 299, 308.) Additional corroborative evidence of Nussbaum's testimony is found in defendant's own statements demonstrating his presence in the apartment on the night of November 1, 1987. (See, People v Hudson, 51 NY2d 233.) Also, a tenant in the same building saw defendant on the building's steps at 10:00 P.M. talking to his client and examining photographs, confirming Nussbaum's account that defendant returned to the apartment at about that time and then left for a few minutes with a file to show to his dinner companion. The wealth of independent evidence tending to connect defendant to the commission of the crime was suffi-cient to permit the jury reasonably to conclude that Nuss-baum was "telling the truth". (People v Glasper, 52 NY2d 970, 971.) No more is needed.

■ There was also ample proof that defendant thereafter failed to provide appropriate and timely medical care for Lisa. The medical evidence established that Lisa's brain had been swelling for 6 to 12 hours before any treatment took place. Based on Nussbaum's account of the events of November 1 and 2, 1987, defendant was fully aware that he had seriously injured Lisa, but made no effort whatsoever to seek medical help for about 12 hours. Defendant, who brought Lisa's limp body to Nussbaum, whose initial efforts to revive Lisa were to no avail, had to know from the outset that Lisa was uncon-scious. His reassurance to Nussbaum that he would help Lisa on his return from dinner also demonstrated that he was aware that Lisa needed medical attention. When he did re-turn, he rejected Nussbaum's pleas to keep his promise. Instead, because he did not believe that they were "relating" well enough to act, he and Nussbaum freebased cocaine. At

6:00 A.M., only after Lisa had been unconscious for 12 hours and defendant noticed that she had stopped breathing, did he take action. And, contrary to defendant's claim, there was an abundance of testimony that Lisa would have survived had she received prompt medical attention.

■ Defendant argues that "no rational juror" could conclude that, in accordance with the People's burden of proof, as charged, he had the intent to cause serious physical injury to Lisa both when he injured her and when he failed to summon medical help for her. Intent, of course, can be inferred from the criminal act itself as well as from the surrounding circumstances. *(People v Bracey,* 41 NY2d 296, 301.) The jury may infer that a defendant intends the natural and probable consequences of his actions. *(See, People v Getch,* 50 NY2d 456, 465.) The existence of the requisite intent presents an issue for jury resolution. *(People v Ainsworth,* 106 AD2d 357, 358.) That the jury could have drawn a different inference from the evidence as to a defendant's mental state does not mean that the evidence of intent is insufficient. *(See, People v Roe,* 74 NY2d 20, 28; *People v Castillo, supra,* 47 NY2d, at 277.)

Here, the jury's conclusion that defendant intended to cause Lisa serious physical injury both when he injured her and when he subsequently failed to provide medical treatment for the injury he caused is supported by the evidence. The experts' testimony described the staggering force behind the blow with which Lisa had to have been struck to sustain the injury she suffered. The enormity of the force is particularly revealing of the wielder's intent to cause serious physical injury. *(See, People v Morales,* 118 AD2d 663, *supra.)* That the blow was directed at Lisa's head, a vital part of the body, provided further support for the conclusion that defendant intended to injure her seriously. *(See, e.g., People v Aveille,* 148 AD2d 461, 462, *lv denied* 74 NY2d 736.)

The jury had other evidence, as well, from which to ascertain defendant's intent. It could reasonably infer that he struck her in a temper because of his belief that Lisa was trying to hypnotize him. In October 1987, as Nussbaum explained, defendant was obsessed with the notion that people were staring at him and trying to hypnotize him. He had complained that Nussbaum had taught Lisa and Mitchell to cast hypnotic stares at him. He had even discussed the matter with Lisa, who admitted staring at him.

According to Nussbaum, when defendant entered the bed-

room shortly before Lisa was injured he was angry. When he later admitted to Nussbaum that he had "knocked [Lisa] down", he connected it to "the staring business", which, he insisted, "had gotten to be too much for her." Thus, the jury could conclude that defendant intended to hurt Lisa seriously.

■ Furthermore, since it was immediately apparent that Lisa was in severe distress, so much so that Nussbaum attempted to administer artificial respiration to her in defendant's presence, his failure to summon medical help only provided further evidence of his intent to cause serious physical injury. Despite Nussbaum's repeated pleas throughout the night, defendant made no attempt to seek medical help until Lisa stopped breathing. Instead, he kept a dinner appointment and freebased cocaine. Since the patent severity of Lisa's injuries and Nussbaum's repeated entreaties put defendant on notice of the critical need for medical assistance, the jury could reasonably conclude that defendant's omission was intentional, not merely reckless.

Defendant's belated instruction to Nussbaum to call 911 does not, as he argues, disprove his intent to cause serious physical injury. At that point Lisa had stopped breathing. While defendant's late effort might show that he did not intend to kill Lisa, it does not detract from the evidence demonstrating the lesser intent to cause serious physical injury. Indeed, that defendant did nothing to that point, even though Lisa lay there unconscious, indicates that he was content with the fact that he had seriously hurt her and with the prospect that her injuries would continue.

Thus, we conclude that defendant's conviction of manslaughter in the first degree was properly based on both his acts of commission and omission. Our review of the evidence shows that every element of the crime was established and that there was sufficient evidence to corroborate Nussbaum's testimony.

Defendant argues that the court erred in failing to give a dispositive negative answer to the jury's request for additional instructions on intent. During deliberations, the jury requested "the following clarification concerning intent. If there was no apparent intent to cause injury but the acts resulted in serious physical injury nonetheless, would that be a ground to include intent as spelled out intent by law [sic]." Defendant urged that the question be answered with a simple "no". The court, however, was of the view that such an answer would be

inadequate since the question showed that the jury was confused about intent and required further instruction on the subject.

■ The jury's question was not as clear as defendant would have it. The question can reasonably be understood as asking whether the jury could find intent "as spelled out by law" from Lisa's injuries alone, even though the jurors found no "apparent intent to cause injury" on defendant's part, i.e., even without a factual finding as to defendant's state of mind. While the court had permitted the jury to infer the specific intent to cause serious physical injury from Lisa's injuries if they saw fit, it had not suggested that intent could be established as a matter of law. The jury's question indicated that some of the jurors were inclined to consider such a finding permissible. While a simple negative answer might have informed the jury that intent could not be found as a matter of law, it could also have obscured the jury's right to infer defendant's intent as a matter of fact. Indeed, a negative answer, without further explanation, could have been misconstrued as a suggestion that Lisa's injuries could not in fact support an inference of intent, or even as a direction to find that defendant lacked a criminal intent.

The trial court cannot be faulted for answering the question in a manner designed to avoid these pitfalls. Thus, the court responded not with a "no" answer, but with a review of all the principles that would govern the jury's determinations on intent. It is noteworthy that nothing in the court's response even remotely implied a positive answer to the jury's question. The court's repetition of its expansive charge on intent, including the instruction that the jury may infer that a person intends the natural and probable consequences of an act done by him, made clear to the jury that a permissible inference could be drawn. *(See, People v Getch,* 50 NY2d 456, 465, *supra; People v Glinsman,* 107 AD2d 710, 711, *lv denied* 64 NY2d 889, *cert denied* 472 US 1021.) Furthermore, as in *Getch (supra)* the court did not leave the jury with the impression that it should or could infer intent solely from a particular act or omission since it also repeated that the jury should consider all the testimony and circumstances surrounding the incident to determine if the requisite intent was present.

It should be noted that a court is never obliged to answer a jury question with a simple yes or no. While the court must "respond meaningfully" *(People v Almodovar,* 62 NY2d 126, 131), since it is in the best position to interpret the jury's

request, it has discretion to fashion the appropriate response. The court may, as here, even respond by repeating its earlier instructions on the same subject. *(People v Malloy,* 55 NY2d 296, 301-304, *cert denied* 459 US 847.) By these standards, the trial court did not abuse its discretion in responding as it did.

*People v Flynn* (290 NY 220), relied upon by defendant and which he claims is "factually parallel" to the instant case, does not support his position. There, the defendant, who shot and killed a bystander moments after attempting a robbery, was tried on a charge of intentional murder. The jury asked whether the proof of premeditation of the robbery carried with it the responsibility for any other crime committed during the commission of the robbery or attempted robbery. The trial court declined to address the question; instead it merely pointed out to the jury that the defendant was not on trial for any crime other than murder and that it had already defined the elements of murder. The Court of Appeals reversed, holding that the court should have answered the question unequivocally in the negative, since it involved purely a question of law. The court also expressed concern that the trial court's answer permitted the jury to find that the shooting was premeditated solely by virtue of the premeditated robbery. Unlike in *Flynn,* the court here answered the question, correctly we find, and did not authorize any improper inference as to defendant's mental culpability.

Defendant claims error in several of the trial court's evidentiary rulings. Before Nussbaum took the stand, the court held a hearing pursuant to *People v Ventimiglia* (52 NY2d 350) to determine whether the People would be permitted to elicit testimony from Nussbaum with respect to various prior assaults of her by defendant, including some where he used a metal exercise bar. The court permitted such testimony, cautioning the prosecutor not to elicit "any great detail". Indeed, Nussbaum's testimony as to these incidents was relatively brief, providing scant detail as to the acts of abuse themselves.

 Defendant now argues that this testimony "had no probative value on the material issues at trial" and was presented solely to show propensity. At trial, however, he conceded that this proof was "unquestionably" relevant and that it would be "silly" to argue otherwise. His only argument then was that the prejudice from the evidence would exceed its probative value since it addressed only the "collateral" issue of Nussbaum's credibility and that the jury would be unable to follow any limiting instructions. As a result of

defendant's concession, which leaves the issue unpreserved for review *(see, People v Gines,* 36 NY2d 932, 933), the People were not required to advance a theory of admissibility. In any event, the carefully circumscribed proof (of over 30 items of proof, the prosecutor asked to and did, in fact, elicit testimony about only 6, although 1 of the 6 consisted of 3 separate incidents) offered as to defendant's physical abuse of Nussbaum was properly admitted.

While evidence of prior bad acts or uncharged crimes may not be adduced if its sole purpose is to demonstrate criminal propensity, it is admissible if it is material and relevant as to a specific issue and its probative value exceeds any prejudice it creates. *(People v Hudy,* 73 NY2d 40, 54-55; *People v Alvino,* 71 NY2d 233, 241-242.) The accepted theories on which such proof may be admitted *(see, e.g., People v Molineux,* 168 NY 264) are "merely illustrative, not exclusive". *(People v Carter,* 77 NY2d 95, 107, *cert denied* — US —, 111 S Ct 1599.) For example, the People may introduce prior bad act evidence "to complete a witness's narrative to assist the jury in their comprehension of the crime." *(People v Mendez,* 165 AD2d 751, 752, *lv denied* 77 NY2d 880.) Evidence of uncharged crimes is not barred merely because the People are able to establish their case without it; they are entitled to present all the admissible evidence available to them. *(People v Alvino, supra,* at 245.) Such proof may be adduced by the People on their direct case. *(Supra,* at 248; *People v Ventimiglia, supra,* at 360.)

Given such a standard, evidence of defendant's physical abuse of Nussbaum was clearly admissible. As the prosecutor explained, it was needed "to explain to the jury the background of [Nussbaum's] testimony, to make it comprehensible and to enhance its credibility." Nussbaum's anticipated testimony—that defendant brought Lisa's unconscious body out of the bedroom, laid her on the floor, told her that he would take care of Lisa when he returned and then left for dinner and that Nussbaum followed that instruction without making any attempt to summon help in the three hours that defendant was gone—would, as the prosecutor noted, seem "patently incredible" without the background that the abuse evidence would provide. Evidence that defendant completely dominated and controlled Nussbaum would offer insight as to why she would, without question, accept defendant's direction that she await his return. Moreover, since defendant and Nussbaum were the only adults in the apartment at the time Lisa

suffered her fatal injury, the evidence would show that Nussbaum lacked the independence and free will to undertake action on her own such as beating Lisa. There is ample case law to support the proposition that uncharged crime evidence may be used to support testimony that otherwise might be unbelievable or suspect. *(See, e.g., People v Le Grand,* 76 AD2d 706; *People v Civitello,* 152 AD2d 812, 813, *lv denied* 74 NY2d 947; *People v Fay,* 85 AD2d 512.)

It should also be noted that the prior bad act testimony allowed here did not consist of a crime victim's testimony that the defendant had, in the past, committed the same or similar acts as those for which he was on trial. Rather, as noted, it explained and substantiated Nussbaum's account of the crime committed against Lisa by showing the relationship that existed between Nussbaum and defendant. Since the evidence of defendant's abuse of Nussbaum was critical to an understanding of her testimony and the trial court prudently exercised its discretion in determining that the probative value of the limited evidence it permitted outweighed its prejudicial effect, we find no error in its admission. Admission of uncharged crimes is "especially warranted" where, as here, "the crime charged has occurred in the privacy of the home and the facts are not easily unraveled." *(People v Henson, supra,* 33 NY2d, at 72.)* Finally, we note that the court, by giving thorough and repeated cautionary instructions to the jury on the limited purpose for which this evidence was being received, minimized the possibility of prejudice. *(See, People v Santarelli,* 49 NY2d 241, 254.)

Nor is there merit to defendant's contention that the court erred in allowing in evidence a videotape showing Nussbaum's physical condition at the time of her arrest. The videotape, which was played, without sound, during the testimony of the technician who took it, during the People's summation and, at the jury's request, during deliberations, showed Nussbaum's various injuries, which included cuts on her scalp, lips, nose and left thigh, black eyes, bruises and other marks on her back, stomach, right buttock, arm and legs, as well as a swollen right leg that appeared to be discharging pus. If relevant to prove or disprove a material issue, photographic evidence is admissible and should be excluded "only if its sole purpose is to arouse the emotions of the jury and to prejudice the defendant". *(People v Pobliner,* 32 NY2d 356, 370, *cert denied* 416 US 905.)

The videotape of Nussbaum's physical condition was prop-

erly admitted since it was relevant to assist the jury in evaluating whether she had the physical capacity to inflict the fatal injury on Lisa. To the extent that the videotape provided graphic evidence of Nussbaum's physical condition, the jury could consider it in deciding whether to exclude her as the person who inflicted the injury. A party is entitled to offer evidence that a person had or lacked the physical capacity to perpetrate the crime charged. *(See, People v Messina,* 278 App Div 592; Richardson, Evidence § 162, at 131 [Prince 10th ed]; *see also,* Fisch, New York Evidence § 231, at 134 [2d ed 1977].) Similarly, the videotape was relevant as to Nussbaum's ability to summon medical help for Lisa. In addition, as the court properly ruled, since the videotape depicted Nussbaum's physical devastation, it was relevant to show that defendant dominated and controlled her, in part through physical abuse. Nor were the People required to use less vivid proof in place of the videotape. Once the relevancy of the videotape was established, the question of whether the jury should be permitted to view it was addressed to the trial court's sound discretion. *(People v Stevens,* 76 NY2d 833, 835.) We find that there was no abuse of discretion. Moreover, the court's limiting instructions regarding the use of the videotape were proper, both in terms of timing and content. We also note that, since Nussbaum could not be expected to provide knowledgeable information as to the nature of her injuries, it also was not error for the court to permit the physician who examined her at Bellevue Hospital on the morning of November 3, 1987, after her arrest, to testify as to the severity and approximate age of many of the injuries, as well as that many of them were consistent with having been caused by trauma. In any event, the People "[are] not bound to stop after presenting minimum evidence but could go on and present all the admissible evidence available to them" *(People v Alvino, supra,* 71 NY2d, at 245).

 Defendant also argues that he is entitled to a new trial because the People violated their obligations pursuant to *People v Rosario* (9 NY2d 286, *cert denied* 368 US 866) with respect to Nussbaum's pretrial statements. Defendant does not suggest that the prosecutor failed to disclose, as required by CPL 240.45 (1) (a), the prior recorded statements of this witness. Rather, he contends that it was improper for the prosecutors to fail to take notes during their interviews of her and thus to be without *Rosario* material with respect to those interviews. The issue is unpreserved since, although defendant

elicited testimony from Nussbaum that the prosecutors did not take notes during their interviews, he never objected or claimed, as he does now, that a *Rosario* violation had occurred. In any event, the claim is meritless.

It is now a firmly settled principle in New York that a prosecutor is obliged to turn over any written or recorded pretrial statements of the People's witnesses which relate to the witnesses' trial testimony. (CPL 240.45 [1] [a]; *People v Rosario,* 9 NY2d 286, *supra.)* The obligation, however, is limited to "written or recorded" statements. Oral statements are not included and since, here, there were no written or recorded statements to be disclosed, the prosecutor did not violate his *Rosario* obligation.

Nor do we find that the spirit of the rule was violated. In arguing that the prosecutor's failure to take notes constituted a deliberate attempt to frustrate the *Rosario* requirement, defendant appears to be claiming a right, which, in the circumstances, he claims he was denied, to have *Rosario* material created. There is no requirement that a prosecutor record in any fashion his interviews with a witness. If the prosecutor chooses to do so, *Rosario* and its progeny require that the recording be furnished to the defense. But nothing in the *Rosario* line of cases in any way imposes an obligation on the prosecutor to create *Rosario* material in interviewing witnesses. Nor do these cases or any related authority hold that a defendant's right of cross-examination is unfairly frustrated by the failure to record the witness's statement.

We have considered defendant's other contentions, not all of which are preserved, and find that they are without merit.

Accordingly, the judgment of the Supreme Court, New York County (Harold Rothwax, J.), rendered March 24, 1989, convicting defendant, after a jury trial, of manslaughter in the first degree and sentencing him to an indeterminate term of imprisonment of from 8⅓ to 25 years, fining him $5,000 and imposing a $100 mandatory surcharge, and the order of the same court and Justice, entered January 17, 1990, denying defendant's motion to vacate the judgment of conviction pursuant to CPL 440.10, should be affirmed.

ROSENBERGER, KUPFERMAN, SMITH and RUBIN, JJ., concur.

Judgment, Supreme Court, New York County (Harold Rothwax, J.), rendered on March 24, 1989, and an order of the same court and Justice, entered on January 17, 1990, are unanimously affirmed.