■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LARRY JOHNSON, Appellant. [601 NYS2d 485] —Judgment, Supreme Court, New York County (Martin H. Rettinger, J.), rendered September 25, 1990, convicting defendant, after jury trial, of sodomy in the first degree, two counts of sexual abuse in the first degree, and burglary in the second degree, and sentencing him to concurrent terms of imprisonment of 10 to 20 years on the sodomy count, 3½ to 7 years on the sexual abuse counts and 6 to 12 years on the burglary count, unanimously affirmed.

Shortly before noon on December 3, 1988, the complainant was walking home after shopping for groceries, and met a female friend in front of the friend's mother's apartment building. The friend lived in complainant's apartment building, and the two walked home together. When they arrived at their building, the two women climbed the stairs to their respective apartments. The friend left complainant in front of complainant's third floor apartment and proceeded up to her own apartment on the fourth floor.

Complainant put her groceries down and opened her apartment door. Suddenly she was pushed or tripped into her apartment and she landed on the floor. She looked up to see the defendant, dressed in army fatigues, standing over her. The defendant dragged complainant into her bedroom as she

screamed and fought with him; then he threw her up against a dresser, knocked her onto the bed and covered her face with a pillow, warning her to be quiet. He then forcibly disrobed her, inserted his fingers into her vagina and rectum, and performed oral sodomy upon her. As defendant was performing these acts he was asking the complainant whether she liked "being raped" and whether she "ever had anybody eat [her] pussy," and he masturbated onto her children's books on the floor.

Defendant then got up and asked if there was any sugar or honey in the house, because he wanted to pour honey on her body and lick it off. After searching her kitchen and not finding what he was looking for, the defendant announced that he was going to the store to buy honey, and that he would be back. Complainant waited until she heard the defendant descend the stairs, then went upstairs to the apartment of a neighbor to telephone the police, as she had no telephone of her own. Before the police were called, the defendant returned and was heard kicking and stomping and banging on complainant's door. When the police arrived at the neighbor's apartment some 5 to 10 minutes later, complainant reported what had happened and described her assailant.

Several police officers left to canvass the area for someone fitting the description given by complainant. When the officers came upon the defendant about 1½ blocks away from the assault, the defendant asked "How did I know that you were coming back?" The officers said that he "fit a description" and wanted to ask him a few questions. In response the defendant asked "Why are you stopping me, for a robbery or a rape?" A jar of honey in a bag was found on the defendant's person. The defendant explained to the police that the honey was medicine which he used in his tea.

Defendant argues that he was denied his constitutional "due process rights to a fair trial" as a consequence of the prosecutor's asking him questions on cross examination about his psychiatric treatment, "including explicit statements he had allegedly made about his sexual feelings to doctors several years before, all for the sole purpose of establishing propensity." Those questions and answers were as follows:

"Q. On October the 22nd, 1984, did you tell a doctor that you believed that everybody wanted to seduce you?

"MR. HABER [Defense Counsel]: Objection.

"A. No.

"MR. HABER: To what he said in 1984, your honor.

"THE COURT: Objection overruled.

"A. (Cont'g) No. * * *

"Q. Did you tell a doctor, on December the 15th, 1982, that you felt inadequate as a man?

"A. No, I don't remember saying that.

"MR. HABER: Objection to the entire line of questioning.

"THE COURT: Mr. Haber, objection overruled.

"Q. Did you tell a doctor on December 15, 1982, that you felt inadequate as a sexual partner?

"A. No, I don't remember that.

"MR. HABER: Objection. Irrelevant and immaterial. * * *

"THE COURT: Overruled.

"MR. HABER: May we approach?

"THE COURT: No, but make a note and you can fill it in later, whatever you want to place in the record. And the jury, of course, is instructed once again: it's the answers coupled with the question that constitutes evidence. You cannot infer any fact from the mere asking of the question. It's the answer coupled with the question that constitutes evidence. So you may not infer any fact from the mere asking of the question, when the answer in and of itself negates the question. That the law. Does everybody understand that? All right. You may continue with your cross-examination."

Several aspects of the aforesaid examination support our conclusion that it did not constitute reversible error. First, the defendant either denied making the statements or denied recollection of making them, and the court forcefully instructed the jury immediately following those questions and answers that negative answers negated the questions, that the questions alone were not evidence, and that the law prohibited making inferences from the questions alone. Second, even if the answers had been in the affirmative, a man's belief that everybody wanted to seduce him, or his feeling inadequate as a sexual partner, does not demonstrate a propensity to commit burglary and forcible sodomy.

Third, the questions asked were relevant, although perhaps only marginally, to explain two aspects of the assault that could have been viewed by the jury as unusual and requiring some possible explanation: that defendant masturbated on the floor while molesting the complainant, and that he believed that the complainant would allow him to return to her apartment to lick honey off her body. Indeed, defense counsel suggested to the jury through his cross examination of com-

plainant that a person who had just committed a crime would not normally return to the scene and would certainly not expect his unrestrained victim to be waiting for him when he returned, for example:

"Q. In other words, you are telling this jury and the Justice of this Court, that Larry went to the kitchen, looked for honey, there was no honey. He then said, I am going to go and get some honey because there is none here, he asked you if anybody used honey on were *[sic]* you and then he said, I will be back, correct?

"A. Correct.

"Q. This is the same Larry Johnson who had just raped you, told you he was going to get some honey and come back?

"A. That's exactly what he said."

This theme was also central to the defense summation, for example: "He never fled. He never walked away. He came back. Is this logical? Does that make sense? If indeed he had committed these crimes, wouldn't he simply leave? He told her, I'm coming back. He wasn't afraid when she told him I'll fix your wagon. He came back. He couldn't get in, walked a block or two away, and stood there. Does that make sense? Is it logical? We are not talking about some loose see *[sic]* movie."

The People also asked defendant some general questions about his psychiatric history, which showed no propensity to commit burglary and sodomy, but rather lent some support to the complainant's testimony about defendant's unusual behavior during the crime. Had the People been prohibited from introducing that evidence, and thus explaining that it was credible that defendant would act in an abnormal manner, defendant would have been unfairly able to exploit the bizarreness of his acts. Instead, that evidence allowed the jurors to consider that defendant might well have acted in an illogical way during and after the crime and rebutted defendant's claim that his return to the apartment meant that the jury had to believe his story of consensual sex because a "normal" sodomist would not act as he had.

Inquiry as to the propriety of evidence of prior bad acts, and by logical extension other potentially prejudicial history, requires a threshold inquiry whether the evidence is relevant to some issue in the case, and not mere propensity. Here, as explained above, the questions were relevant to explain the more unusual aspects of the defendant's conduct, but for the most part the questions complained of yielded answers that

were adverse to the People's position. The next inquiry is whether the probative value of the evidence is outweighed by its potential for mischief, which is a discretionary issue for the trial court in the first instance *(People v Hudy,* 73 NY2d 40, 55; *see also, People v Steinberg,* 170 AD2d 50, 74, *affd* 79 NY2d 673). We find no undue prejudice or abuse of discretion by the trial court in permitting limited questioning pertinent to the unusual aspects of the crimes charged, and thus no ground for reversal.

Defendant's reliance on *People v Nieves* (186 AD2d 276) is misplaced. There the prosecutor asked the defendant if she had been hospitalized for psychiatric problems when she was 14 years old, some 25 years before the crime. The defendant responded that she had been hospitalized because she had come from a violent household. During summation, the prosecutor argued that defendant had plunged a knife into the victim's chest and thought that she was going to get away with it because of her " 'psychological disturbance.' " *(Supra,* at 278.) The Appellate Division held that the prosecutor should not have been permitted to ask questions of the defendant about her psychological history because it had no relevance to the crime and because it showed only that defendant had been hospitalized for some "undescribed psychiatric problem * * * some 25 years before the alleged crime." *(Supra,* at 279.) The Court set forth its reasoning thus: "The only purpose served by the prosecution's use of this evidence was to prejudice the jury against the defendant by permitting the inference that she assaulted the complainant with a knife as a result of a psychiatric illness that caused her to act irrationally or violently. Indeed, on summation the prosecutor expressly linked this assault to the defendant's alleged 'psychological disturbance'. This was inflammatory and improper as there was no evidence that the defendant was suffering from any such disturbance at the time of this assault. Then, after improperly characterizing the defendant as suffering from a psychological disturbance, the prosecutor improperly impugned her credibility by accusing her of being a 'manipulator' who was crying for the jury's sympathy." *(Supra,* at 279.)

Here, unlike *Nieves,* defendant's psychiatric history was relevant to important issues raised in the case—it helped explain the victim's testimony about the defendant's bizarre behavior during and immediately after the crime itself, and it was not admitted to show propensity. Moreover, unlike *Nieves,* defendant's psychiatric treatment did not occur 25 years before the crime. Thus, unlike *Nieves,* we cannot say that the

court abused its discretion when it admitted evidence of defendant's psychiatric past. We have considered the defendant's remaining contentions and find them to be without merit or unpreserved by objection. Concur—Carro, J. P., Rosenberger, Wallach, Kupferman and Rubin, JJ.