■ BRIAN P. HOTALING, Respondent, v CSX TRANSPORTATION, Appellant. [773 NYS2d 755]—

Kane, J. Appeals (1) from a judgment of the Supreme Court (Teresi, J.), entered January 3, 2003 in Albany County, upon a verdict rendered in favor of plaintiff, and (2) from an order of said court, entered February 13, 2003 in Albany County, which denied defendant's motion to set aside the verdict.

Plaintiff was employed as a conductor in defendant's train yard. On March 20, 2001, plaintiff and an engineer were assigned to move an engine through the train yard. It is common for several trains to move simultaneously on parallel tracks, and plaintiff was aware that another engine pushing three cars was traveling on a track parallel to his train. Plaintiff rode his train with both feet on the bottom step of a ladder located on the side of the front of the engine, with both shoulders parallel to the ladder, looking in the direction that his train was moving. He rode in this manner so that as his engine approached a manual switch, he could safely stop the engine, disembark, throw the manual switch, then remount. According to Barbara Fosmire, defendant's yard master and plaintiff's immediate supervisor, plaintiff was performing his duties in the manner required by defendant and was positioned on the engine in the proper location.

To control and coordinate the movement of the trains, a tower conductor uses a control panel in the tower to electronically line and lock all train routes in the yard. Once a route is locked, it cannot be changed unless it is unlocked by the tower conductor, who has full control over the routes and movements of trains in the area controlled by electronic switches. After a route is lined and locked, the tower conductor gives the ground crew riding the train permission to move their train. The ground crew is not informed of each switch the train will pass through, nor does the crew choose its route. They are only informed of its destination. The tower conductor's grant of permission to move is relied upon as proof that the route is safely and properly lined and locked.

When plaintiff's engine reached one of the electronic switches, plaintiff noticed that the engine pushing three cars was headed for the same switch at the same time. Apparently, defendant's tower conductor had routed both trains into the same switch simultaneously. Plaintiff became aware of this impending collision only seconds before impact. He attempted to scramble up the ladder out of harm's way, but, unfortunately, could not do so

in time. The other train caught plaintiff's leg and pulled him down into the core of the accident. Plaintiff's "left leg was virtually blown open from about the middle of his thigh down to his calf and he had no kneecap . . . [a]nd his right foot was pinned between the engine and the car that had hit him." Two emergency response teams arrived to assist in extracting plaintiff from the wreckage and treating his injuries. When rescuers attempted to free plaintiff's right foot by cutting the engine's grab iron with a torch, pieces of metal were scattered into his open wounds. In addition, the torch caught plaintiff's pants on fire and Fosmire had to throw snow on him to extinguish the flames. A crane was utilized to lift the car that collided with plaintiff's engine. That effort was halted when the car began slipping and plaintiff screamed that the shifting movement was "ripping his leg off." After an unsuccessful attempt to separate the car and engine with an airbag system, a hydraulic spreading tool was used to pry the trains apart and free plaintiff. Throughout the $1\frac{1}{2}$ hours that it took to extricate plaintiff from the train wreck, plaintiff never lost consciousness and continuously screamed in agony, expressing fear that he was going to die. He was airlifted by helicopter to Albany Medical Center, where he remained for nearly two months.

During that period of hospitalization, plaintiff underwent 11 surgical procedures on his legs. These procedures included placement of hardware to set fractured bones, debridement to remove dead tissue, a leeching procedure to alleviate blood flow problems and skin grafts from both his right and left legs. Plaintiff was in constant pain, had difficulty sleeping and became increasingly discouraged. For the last surgery, plaintiff had to make a choice between two procedures. One required removing muscles from his back to place over his left knee, because the prior skin grafts were unsuccessful. Removing these muscles from his back would result in a permanent restriction in arm movement. There was no guarantee regarding the success of that procedure on his knee. After thoughtful deliberation, plaintiff selected the other option, an above-the-knee amputation of his left leg.

After the amputation, plaintiff continued to experience problems. He still had difficulty sleeping, was discouraged at his progress and now had phantom pain in his missing limb. His home had to be renovated for wheelchair accessibility. Wheelchairs had to be ordered specially because ordinary models could not accommodate plaintiff's large frame. Although he was fitted for a prosthetic leg, ambulating in it was difficult and frustrating. Injuries to the right ankle and foot made balancing and

support problematic. In addition, his stump was covered with grafted skin. Grafted skin does not produce normal sensation and breaks down more quickly, causing sores and pain which limit his ability to ambulate with the prosthesis. As a result, he is mainly confined to a wheelchair.

Plaintiff was previously an athlete and outdoorsman. His baseball pitching abilities caught the attention of scouts for a professional baseball team. While stationed at Camp LeJeune, he was selected to participate on the All-Marine football team. At the time of the accident, plaintiff was 37 years old, married and the father of two young children. He still played softball and football and engaged in numerous outdoor activities with his family. Plaintiff built his own home next to his parents so he could care for them as they aged. After the accident but before trial, plaintiff's father became sick and passed away. Plaintiff's physical condition prevented him from rendering any assistance to his dying father. Because of his injuries and the resulting disabilities which drastically altered his way of life, plaintiff suffered from severe depression. He also suffered from post-traumatic stress disorder.

Plaintiff commenced this action pursuant to the federal Employers' Liability Act (see 45 USC § 51 et seq. [hereinafter FELA]). At trial, Supreme Court granted plaintiff's motion for a directed verdict on the issues of defendant's liability and the absence of contributory negligence. Regarding damages, the jury awarded plaintiff $6 million for past pain and suffering, $96,300 for past economic loss, $2 million for future pain and suffering, $1,118,000 for future economic loss and $1.5 million for future medical expenses, for a total of over $10.7 million. Defendant appeals from the judgment entered on the verdict and from the court's order denying its motion to set aside the verdict.

Supreme Court properly granted plaintiff's motion for a directed verdict based on plaintiff's lack of contributory negligence. Courts may grant directed verdicts where, based on the evidence presented and affording the nonmoving party every proper inference from that evidence, there is no rational process by which the jury could find for the nonmoving party (see Szczerbiak v Pilat, 90 NY2d 553, 556 [1997]; Calafiore v Kiley, 303 AD2d 816, 816-817 [2003]). The standard for determining contributory negligence in FELA actions is considerably more liberal than at common law (see Swartout v Consolidated Rail Corp., 294 AD2d 785, 786 [2002]). Under FELA, a jury is entitled to find negligence if a party's actions "played any part, even the slightest, in producing the injury" (Rogers v Missouri

*Pac. R.R. Co.*, 352 US 500, 506 [1957]; *see* 45 USC §§ 51, 53; *Curley v Consolidated Rail Corp.*, 81 NY2d 746, 747 [1992], *cert denied* 508 US 940 [1993]; *Swartout v Consolidated Rail Corp., supra* at 786; *Ganotis v New York Cent. R.R. Co.*, 342 F2d 767, 768 [1965]; *Keeton v Norfolk S. Corp.*, 49 F Supp 2d 590, 593 [1999]).

Defendant bore the burden of proving contributory negligence (*see Paluch v Erie Lackawanna R.R. Co.*, 387 F2d 996, 999 [1968]). Defendant does not claim that plaintiff contributed to the collision, but instead attempts to show that plaintiff contributed to his injuries, first, by failing to select a safer position on the engine and, second, by failing to look around in order to discover danger. First, to satisfy its burden of showing contributory negligence "where alternate reasonable courses of action existed, the defendant needs to show that the plaintiff's actions were unreasonable" (*Keeton v Norfolk S. Corp., supra* at 593). Plaintiff and Fosmire testified that plaintiff's position on the engine was safe, proper and in accordance with defendant's rules, and that he was exactly where he was required to be. Although defendant established that it was possible for plaintiff to perform his duties from some other position, defendant failed to prove the unreasonableness of plaintiff's choice to assume a position that his supervisor deemed safe and proper.

Second, despite defendant's claims that plaintiff was contributorily negligent by failing to look around in order to discover danger, rather than continually looking in his direction of travel, plaintiff had no reason to be concerned about a train on a parallel track, particularly where he had already passed that train and encountered no hazards. "Certainly, it is not contributory negligence to fail to discover a danger when there is no reason to apprehend one" (*Paluch v Erie Lackawanna R.R. Co., supra* at 999 [citation omitted]). Plaintiff could likewise rely on the permission to move as proof that his route was safely lined and locked (*see Knierim v Erie Lackawanna R.R. Co.*, 424 F2d 745, 747 [1970]). It was therefore reasonable for plaintiff to keep his attention focused in front of him to properly discharge his duties. Thus, Supreme Court properly determined that there was no proof of contributory negligence to be submitted to the jury.

Supreme Court appropriately excluded certain evidence at trial relating to plaintiff's position on the engine, work and safety rules that plaintiff allegedly violated, and speed tapes from the two trains. The court permitted some inquiry into plaintiff's position on the engine, but properly excluded additional questioning as related to assumption of risk (*see* 45

USC § 54 [barring assumption of risk defense in FELA actions]; *Taylor v Burlington N. R.R. Co.*, 787 F2d 1309, 1316 [1986]). Defendant's work and safety rules were properly excluded because, despite plaintiff's discovery demands, defendant failed to identify any specific rules it alleged that plaintiff violated. Significantly, even at trial, defendant could not articulate to the court the exact rules that plaintiff allegedly violated. The speed tapes recorded the speedometer and odometer readings, along with the time, from the night of the accident. Defendant sought to admit the tapes to show the relative positions of the trains immediately before the collision. Defendant conceded that the tapes from each train were not calibrated to each other so it would not be accurate to compare them side by side. Numbers relating to distances and times may lead to juror speculation unless expert proof puts them into context to explain their significance (*see Vogel v Gilbo*, 276 AD2d 977, 980 [2000]). As defendant had no expert to interpret the speed tapes, the court appropriately precluded their admission into evidence.

Defendant failed to preserve its arguments regarding future economic damages. When Supreme Court specifically asked for motions in limine, defense counsel indicated that defendant had none. Although a pretrial memorandum mentioned issues which would potentially be raised at trial regarding plaintiff's expert economist's methodology, no motion was made to limit or preclude his testimony. Additionally, no objections to the methodology were made during that testimony. At the end of plaintiff's case, defendant moved to strike the economist's testimony based on the economist's improper method of computing plaintiff's lost pension benefits. The motion did not raise the issue of the economist's failure to deduct railroad retirement taxes when computing future lost wages. Defendant did not object to the final charge, which properly instructed the jury to deduct state and federal taxes from future economic loss, but which did not specifically mention railroad retirement taxes. No instructions regarding proper pension computation were requested or given. Based on defendant's failure to timely raise its objections to plaintiff's economist's methodology, those issues were not preserved for our review and any alleged error is deemed waived (*see* CPLR 4017, 5501 [a] [3]; *Horton v Smith*, 51 NY2d 798, 799 [1980]; *Pilon v Pilon*, 278 AD2d 760 [2000]).

Contrary to defendant's contention, the testimony of plaintiff's expert life care planner was admissible. His testimony was based on a review of plaintiff's medical records. Three of plaintiff's treating physicians testified at trial and the medical records were introduced into evidence. While two treating physi-

cians did not testify, their testimony was not required because one merely provided a second opinion regarding amputation and the other participated in three surgeries attended by physicians who testified. Thus, the expert's opinion was not based on inadmissible hearsay (*compare Erosa v Rinaldi*, 270 AD2d 384 [2000]). However, the jury's award for future medical expenses is unsupported by the evidence. Plaintiff's expert opined that the value of plaintiff's future medical needs totaled $1,146,260. The jury, however, awarded $1.5 million. As this award was not based on evidence, but on speculation, we set aside that portion of the damages award and order a new trial on that issue unless plaintiff stipulates to a reduced award of $1,146,260 (*see Cramer v Kuhns*, 213 AD2d 131, 138-139 [1995], *lv dismissed* 87 NY2d 860 [1995]).

Without minimizing the horrific experience that plaintiff endured while he was trapped in the wreckage, the severity of his injuries, his multiple operations or the devastating impact of the loss of his leg, we find that the jury's award of $6 million for past pain and suffering covering a period of less than two years is so excessive as to shock the judicial conscience. In evaluating the excessiveness of awards of damages in FELA cases, the courts apply the federal standard of whether the damages awarded are so excessive as to " 'shock judicial conscience' " (*Schneider v National R.R. Passenger Corp.*, 987 F2d 132, 137 [2d Cir 1993], quoting *Nairn v National R.R. Passenger Corp.*, 837 F2d 565, 567 [2d Cir 1988]; *see Smith v National R.R. Passenger Corp.*, 856 F2d 467, 472 [2d Cir 1988]). While this standard may be more deferential to the jury's verdict than the New York standard of whether the award "deviates materially from what would be reasonable compensation" (CPLR 5501 [c]; *see Bean v CSX Transp.*, 289 F Supp 2d 277, 283-284 [ND NY 2003]), we nonetheless may take into account whether a particular award is excessive by comparing it with awards in other similar cases (*see Nairn v National R.R. Passenger Corp., supra* at 567; *Bean v CSX Transp., supra* at 285).

The jury's verdict as to past pain and suffering here greatly exceeds virtually all recent awards of such damages in New York for similarly severe leg injuries resulting in amputation and, in some cases, it exceeds the amount awarded for both past and future pain and suffering (*see Kovit v Estate of Hallums*, 307 AD2d 336, 337 [2003] [award of $5 million for past pain and suffering reduced to $2 million]; *Hoenig v Shyed*, 284 AD2d 225, 225 [2001] [award of $2 million for past pain and suffering affirmed]; *Walker v Zdanowitz*, 265 AD2d 404, 404 [1999] [award of $3.5 million for past pain and suffering reduced to

$2.5 million]; *John v City of New York*, 235 AD2d 210, 211 [1997] [award of $2.5 million for past pain and suffering over 4½-year period affirmed]; *Sladick v Hudson Gen. Corp.*, 226 AD2d 263, 263 [1996] [award of $2.5 million for past pain and suffering affirmed]; *Chung v New York City Tr. Auth.*, 213 AD2d 619, 620 [1995] [award of $1.5 million for past pain and suffering for double amputation reduced to $600,000]; *but see Bondi v Bambrick*, 308 AD2d 330, 331 [2003] [award of $9.75 million for past *and* future pain and suffering of active 35-year-old woman with pervasive scarring and a wound that may never heal affirmed]). The award here also significantly exceeds the reported awards in the state and federal courts under FELA for past pain and suffering for serious injuries sustained in railroad accidents. Significantly, plaintiff cites no similar case for comparison with the verdict here, let alone one with an award for past pain and suffering in an amount even approaching that awarded here. There appears to be only one reported FELA case in the last 10 years involving a specific jury award for a serious leg injury and amputation, and that case was remanded for retrial of damages due to excessive awards for past and future lost earnings and medical expenses (*see Williams v Missouri Pac. R.R. Co.*, 11 F3d 132, 135 [10th Cir 1993] [award of $117,000 for past *and* future pain and suffering]). Nevertheless, the excessive $3.1 million *total* verdict in that case was barely more than half that awarded here for past pain and suffering alone.

Giving consideration to plaintiff's agony during his protracted rescue, his multiple surgeries and the devastating impact of the loss of his leg, we find that $4 million is the highest amount for past pain and suffering that can be justified here. Accordingly, we modify the judgment to the extent of vacating that portion which awarded plaintiff damages for past pain and suffering, and order a new trial on that issue, unless plaintiff stipulates to reduce the amount of said award to $4 million.

Crew III and Rose, JJ., concur.

Cardona, P.J. (dissenting). We respectfully dissent from so much of the majority decision that finds that the jury's award to plaintiff of $6 million for past pain and suffering cannot be justified.

It is undisputed that the applicable standard of review in evaluating the measure of damages in actions pursuant to the federal Employers' Liability Act is whether the jury's damages award is "grossly excessive" or "shocking to the judicial conscience" (*Grunenthal v Long Is. R.R. Co.*, 393 US 156, 159 n 4 [1968]). While there is no question that the subject award was substantial, we cannot say, applying the above standard, that it

was inappropriate given the unique circumstances and elaborated evidence describing the traumatic nature of plaintiff's injuries, the pain and suffering he endured in the course of the horrific and protracted 1½-hour extrication ordeal while he was fully conscious (*cf. Lubecki v City of New York*, 304 AD2d 224 [2003] [in wrongful death action, $3 million awarded for the decedent's conscious pain and suffering experienced during extended hostage situation]). Additional factors to be considered include plaintiff's multiple surgeries, mental anguish preceding the decision leading to eventual amputation, loss of enjoyment of life and his difficult adjustment in resuming a normal life while hampered by severe depression and posttraumatic stress disorder.

Certainly, review of verdicts in other cases is appropriate, but such review cannot be the sole factor considered. Each case must still be considered on its own merits and it cannot be disputed that this is a case with an extraordinary set of facts. A jury's struggle with those facts deserves deference, as does Supreme Court's determination that the jury's award should not be set aside (*see Douglass v St. Joseph's Hosp.*, 246 AD2d 695, 697 [1998]; *see also Kirsch v Fleet St., Ltd.*, 148 F3d 149, 165 [1998]). Accordingly, under all the circumstances, we cannot say that the verdict with respect to past pain and suffering is so high that to allow it to stand would be an injustice.

Therefore, we would affirm the jury's award as to past pain and suffering.

Mugglin, J., concurs. Ordered that the judgment and order are modified, on the law, without costs, by reversing so much thereof as awarded plaintiff $1.5 million for future medical expenses and $6 million for past pain and suffering; new trial ordered on the issues of future medical expenses and past pain and suffering unless, within 20 days after service of a copy of the order herein, plaintiff stipulates to reduce said awards to $1,146,260 and $4 million, respectively, in which event the judgment and order, as so modified, are affirmed.