[828 NYS2d 36]

MICHELE LAUNDERS, as Administratrix of the Estate of BABY GIRL LAUNDERS, also Known as LISA, Deceased, Respondent, et al., Plaintiff, v JOEL STEINBERG, Appellant, et al., Defendants.

First Department, January 16, 2007

*Joel Steinberg*, appellant pro se.

*Law Offices of Wayne J. Schaefer, LLC*, Melville (*Wayne J. Schaefer* of counsel), for respondent.

## OPINION OF THE COURT

CATTERSON, J.

Joel Steinberg, the defendant-appellant, is a convicted child killer and abuser who fatally felled his six-year-old daughter with one blow of his hand, and then went out to dinner as she lay on a bathroom floor losing consciousness over the next 8 to 10 hours. He appeals now from a judgment that awarded damages against him for the pain and suffering he caused the little girl during her life, and in the tormented hours before her death.

█ Steinberg who appears pro se in this action complains, inter alia, that because the first-grader's death was preceded by "*at most* eight hours of pain and suffering" and "*quick* loss of consciousness" (emphasis supplied), the award of $15 million in compensatory and punitive damages is excessive. We disagree, and in simply so stating acknowledge that sometimes words fail even those who use the language to render judgments on a daily basis.

We also disagree with the dissenting views that this award is not merited because it does not fall within the boundaries set by case law. Arguably, *Donlon v City of New York* (284 AD2d 13, 18 [2001]) speaks to an obligation to "determine what awards have been previously approved on appellate review and [to] decide whether the instant award falls within those boundaries." However, we find no such obligation here. This case of an abusive father killing his child by knocking her down with a "staggering" blow to her head and then leaving her without medical attention while he enjoyed dinner and freebased cocaine is without precedential analog. Consequently, we find ourselves free to evaluate the award on the basis of "subjective opinions which are formulated without the availability, or guidance, of precise mathematical quantification." (*See Reed v City of New York*, 304 AD2d 1, 7 [1st Dept 2003], *lv denied* 100 NY2d 503 [2003].)

For the reasons set forth below, we affirm the award of $5 million for Lisa's pain and suffering for eight hours; $5 million

for Lisa's pain and suffering as a battered child; and $5 million in punitive damages against Joel Steinberg.

On November 4, 1987, Lisa Steinberg died in the hospital after efforts to revive her failed. She was 6½ years old. She had just started first grade. She was 3 feet, 10 inches tall and weighed 43 pounds. Subsequently, medical evidence would show that a " 'tremendous' force, equivalent to a fall from a tall flight of stairs or third-story window and consistent with a blow from a 6-foot tall, 180-pound man . . . had been applied to her head." (*People v Steinberg*, 170 AD2d 50, 59 [1991], *affd* 79 NY2d 673 [1992].) Doctors at the hospital where she was brought when she finally stopped breathing that night later testified that her brain had been swelling for 6 to 12 hours before any medical treatment took place. (*Id.* at 68.)

Meanwhile, bruises of "varying ages" evident on her body told a story of weeks, if not months, of prior physical abuse. Medical personnel observed brownish-green bruises on her arms and legs and inner thigh. There were multiple yellow to yellow-brown bruises on Lisa's chest and on her right side and a black and blue bruise on her left buttock. There were bruises on her back over her left shoulder blade, and in the lumbosacral area.

Further, medical personnel observed that Lisa's hair was heavily matted and tangled; a two-inch chunk of hair had been either cut or pulled out near the back of her neck; her toenails were dirty, her feet had "six layers of dirt" on the soles and her body smelled of urine and vomit. (*Id.* at 57.) Steinberg, at the time a practicing attorney who was admitted to practice in this department, and who had taken Lisa as a newborn into the home he shared with his live-in girlfriend, Hedda Nussbaum, lied; he told the doctors at the hospital that Lisa had choked on vegetables that she was eating.

Testimony at the underlying criminal trial established that Steinberg had "knocked . . . down" Lisa at around 6:00 P.M. on the evening of November 1. (*Id.* at 56.) He then carried her limp body to Nussbaum in the bathroom. While Steinberg dressed to go to dinner, Nussbaum placed Lisa on the bathroom floor and made unsuccessful attempts to revive her. When Steinberg returned to the apartment at 10:00 P.M. that night, he and Nussbaum freebased cocaine for a couple of hours as Lisa still lay on the bathroom floor. Finally, at approximately 4:00 A.M., about 10 hours after Lisa was first placed on the bathroom floor, Steinberg picked her up and put her on a bed. Paramedics were summoned about 40 minutes after Lisa had stopped breathing at 6:40 A.M.

Steinberg was indicted for murder in the second degree, manslaughter in the first degree and related offenses. Following a lengthy trial he was acquitted of murder but convicted of manslaughter in the first degree. After sentencing, on March 24, 1989, Steinberg moved unsuccessfully to set aside the judgment. In an order entered August 8, 1991, this Court affirmed the conviction. (*People v Steinberg*, 170 AD2d 50 [1991].)

Meanwhile, in 1988, plaintiff Michele Launders, Lisa's biological mother, who, following Lisa's birth, had informally transferred custody of her to Steinberg, brought this action as administratrix of Lisa's estate against Steinberg, Nussbaum, and various city agencies. Several of the causes of action involved claims against various employees and agencies of the City of New York alleging that they failed to take appropriate action to protect Lisa once presented with evidence that she was an abused child.

In the fifth, sixth and seventh causes of action, Launders alleged that Steinberg and Nussbaum were liable for assault and battery upon taking custody of Lisa, for the prolonged and severe pain and suffering thereby endured by Lisa, and for negligence in their failure to summon medical care once it was apparent that Lisa's life was in danger.

In an order dated October 10, 1989, Justice Nardelli (then sitting in Supreme Court) awarded summary judgment to Launders against Steinberg on those causes of action, reasoning that "the serious nature of Lisa's injuries and Steinberg's being the cause of such injuries cannot be contested." On September 30, 1999, on the eve of trial, plaintiffs and the city defendants entered into a settlement in which the city defendants agreed to pay plaintiffs $985,000 in satisfaction of all claims naming them as defendants. Inasmuch as Launders expressly reserved her right to proceed against Steinberg on the remaining causes of action, in February 2001 she filed a note of issue and sought a damages inquest.

Less than one week before the scheduled commencement of the damages inquest, Steinberg moved by order to show cause for leave to file an answer in which he raised the defenses of setoff, pursuant to General Obligations Law § 15-108, and apportionment, pursuant to CPLR article 16. In an order entered October 10, 2002, the court granted Steinberg's motion only to the extent of allowing him to assert a claim for a setoff, since that amount was known to Launders and required no additional discovery or preparation. However, the court denied an amend-

ment for apportionment on the grounds that the plaintiff would be greatly prejudiced by the "additional, practical burden of preparing evidence to show the limited culpability of Hedda Nussbaum and the city."

At the inquest, held to assess the extent of damages to be awarded, a number of witnesses testified as to evidence of prior abuse as well as the pain and suffering Lisa would have endured as she was dying. Stacy Zeitz, a student teacher who observed Lisa on a daily basis during the months preceding her death, testified as to the bruises she had observed on Lisa's body as well as Lisa's unkempt appearance during the two months before her death.

Michael Baden, M.D., a forensic pathologist, reviewed records from the hospital and the Office of the New York City Medical Examiner, as well as the transcripts of the testimony of two physicians who were the People's witnesses at the criminal trial. He testified that, in his opinion, Lisa died as a result of specific injuries consisting of multiple blunt, considerable-force traumas on the body with traumatic injury to the brain and bleeding around the brain. While mentioning that Lisa had "bruising of different ages [on] her body, some going back two weeks," he added that the significant injuries that caused her death were impacts to the head which did not fracture the skull but caused the brain to bleed and swell and the lower part of the brain where the breathing centers are located to be compressed, thereby preventing Lisa from breathing.

He stated that Lisa would not necessarily have immediately lost consciousness after receiving this type of injury, and in fact the hospital records, including Steinberg's statements when she was admitted, indicate that the head injury occurred around dinner time, causing persistent vomiting until she lost consciousness 8 to 10 hours later. During that period Lisa likely experienced a severe headache, and at some point probably experienced great discomfort in being unable to catch her breath.

Margaret McHugh, M.D., an expert in pediatrics and child abuse, testified that, after a review of the same records and photographs, none of Lisa's bruises were consistent with injuries a child typically sustains in the normal course of play, and that her bruises, which likely resulted in pain, seemed to be in various stages of healing. Coupled with the indications that Lisa had poor hygiene, Dr. McHugh testified that it appeared that Lisa was an abused child.

Launders also introduced into evidence the records of the Medical Examiner's Office with autopsy results; 15 color photographs taken of Lisa upon her admission to St. Vincent's Hospital; and the hospital records following her admission.

Steinberg produced no evidence. The court awarded Launders $15 million stating:

> "For the pain and suffering during those 8-10 tormented hours before Lisa's death, I award plaintiff $5,000,000 ($5 million).

> "For the general pain and suffering resulting from the injuries she endured as a battered child, I award plaintiff $5,000,000 ($5 million).

> "For punitive damages resulting from the heinous and outrageous crime committed against Lisa Steinberg, I award plaintiff $5,000,000 ($5 million)."

On appeal, Steinberg asserts that (a) the damages award is excessive; (b) his criminal conviction for causing Lisa's death did not establish that he was responsible for any purported injuries sustained before the night of her death, and thus the inquest court had no authority to conduct a hearing on new theories of liability; and (c) he is entitled to a setoff.

Steinberg's assertions are entirely without merit. First, for Steinberg to dismiss the 8 to 10 hours preceding Lisa's death as *"at most* eight hours of pain and suffering" or as he alternatively states, a *"quick* loss of consciousness" (emphasis supplied), demonstrates that he is as devoid of any empathy or human emotion now as he was almost 20 years ago when he stood trial for Lisa's homicide. As any parent and, no doubt, most adults who have taken trips with young children can attest, the oft-heard question, "are we there yet?" is a clear illustration that, the more anticipated an event or destination so, seemingly slower the passage of time in a child's mind. For Lisa, lying on a bathroom floor, her body aching from bruises of "varying ages," her brain swelling from her father's "staggering blow," those 8 to 10 hours so cavalierly dismissed by Steinberg must have seemed like eternity as she waited and wondered when someone would come to comfort her and help make the pain go away.

If, as the dissent observes, the only relevant inquiry is what amount is necessary to justly and fairly compensate the victim (*see Tate v Colabello*, 58 NY2d 84, 88 [1983]), then the inquiry must phrase the question in terms of just and fair compensation for the physical pain endured for "seeming eternity" as well as

the mental anguish suffered by a child who could not comprehend her father's brutality, or her equally brutalized mother's helplessness towards.

Steinberg argues that there is no award "even remotely" approaching this one and urges this Court to review decisions collected in Annotation, *Excessiveness and Adequacy of Damages for Personal Injuries Resulting in Death of Minor* (49 ALR4th 1076). He does not, however, cite one case where the situation is analogous to his own. To borrow his own words: There is no case that *even remotely approaches* this one on the facts, and so, there is no obligation on our part to make the awards comparable. Nor do we find it helpful, as the dissent suggests, to look at case law involving medical malpractice lawsuits or various tort suits brought against the City, and therefore essentially involving compensatory damages for injuries sustained through the negligence of strangers. Not a single case cited by Steinberg or the dissenters involves pain and suffering intentionally inflicted on a child by the very adult entrusted with the caring and nurturing, not to mention the loving of that child.

Consequently, we find that $5 million is just and fair compensation for the "tormented" hours preceding Lisa's death, and so affirm that part of the award.

■ Second, we reject Steinberg's contention that the award of summary judgment as to liability for prior assault and battery (abuse) on the basis of collateral estoppel was in error. Steinberg argues that the verdict at the criminal trial did not reflect any necessary finding that he was responsible for assaulting Lisa on prior, earlier occasions. We disagree.

It is well-settled law that collateral estoppel may be employed in a civil action to preclude relitigation of issues actually and necessarily determined in a prior criminal action. (*S.T. Grand, Inc. v City of New York*, 32 NY2d 300 [1973].)

> "A criminal conviction . . . is conclusive proof of its underlying facts in a subsequent civil action and collaterally estops a party from relitigating the issue. All that is required to give collateral estoppel effect to a criminal conviction is that there be an identity of issues in the criminal and subsequent civil actions and that the defendant . . . had a full and fair opportunity to contest the issues raised in the criminal proceedings." (*Grayes v DiStasio*, 166 AD2d 261, 262-263 [1st Dept 1990] [citations omitted]; *see also Ryan v New York Tel. Co.*, 62 NY2d

494, 500 [1984] [the issue must have been material to the first action and essential to the decision rendered therein].)

Major portions of Steinberg's trial focused on the abuse of Lisa in the weeks prior to her death. It was an issue that was raised in opening statements and summations, litigated fiercely and determined since the thrust of Steinberg's defense was to point the finger of blame at his one-time girlfriend, Hedda Nussbaum. In order to do so, Steinberg attempted to show that the "evidence [was] consistent with Hedda Nussbaum being the person who caused the injuries to Lisa."

The court clearly acknowledged that the evidence of prior abuse was relevant to the charges against Steinberg. In charging the jury, the court stated: "The People contend they have proved the following circumstantial facts . . . that Joel Steinberg previously abused Lisa Steinberg on several prior occasions . . . The defendant, on the other hand, contends that . . . the credible evidence is that Joel Steinberg always acted lovingly toward Lisa Steinberg."

In effect, the People's theory of manslaughter in the first degree required that they show that Steinberg, with intent to cause serious physical injury to Lisa, injured her and then failed to obtain medical assistance for her, causing her death. Under the court's charge, the People were required to prove both the act of commission and omission and the requisite mens rea— intent to cause serious physical injury—with respect to each.

To support their case that Steinberg intended to cause serious injury and he, not Hedda Nussbaum, was responsible for Lisa's death, the People offered evidence at trial that established that Steinberg had abused Lisa on previous occasions. (*See People v Steinberg*, 170 AD2d at 66.)[1]

The evidence included testimony by Hedda Nussbaum that in the month prior to Lisa's death, Steinberg had grabbed Lisa by

---

1. The dissenting views that this is not a necessary determination by the jury that Steinberg abused Lisa on prior occasions ignore the following plain reading of this segment from Justice Sullivan's opinion: "Review of the record reveals that the only reasonable conclusion was the one that even defendant's own expert reached, i.e., that Lisa's death was a homicide, resulting from child abuse." (*Id.*) Lisa was abused on the night in question by one of two adults in her home. "The record also yields powerful evidence that it was defendant who was responsible for Lisa's death." (*Id.*) Despite Steinberg's attempts to pin the blame on Hedda Nussbaum, the only other adult in the home, all the evidence direct and circumstantial, points to the fact that it was Steinberg who abused Lisa that night and so caused her death. "The evidence

the arms, shaken her and thrown her to the ground; that he had instructed Nussbaum to dress Lisa in long sleeves until the bruises healed; and it included the testimony of a client of Steinberg's who witnessed Steinberg hit Lisa in the face. (*Id.*)

The witness at the criminal trial, Charles Scannapieco (hereinafter referred to as CS), testified about an incident which occurred when Lisa fell asleep in his lap while Steinberg drove them to Albany the month before Lisa died. As the following excerpt from the trial transcript shows, the witness testified fully about this incident of abuse:

> "[CS]: Right after she fell asleep, she might have been sleeping I'd say ten or fifteen minutes and out of the clear blue sky, I mean, I was shocked but he just reached over . . .
>
> "[DEFENSE ATTORNEY]: Objection . . . Move to strike. . . .
>
> "COURT: Don't tell us the workings of your mind. Just tell us what you saw and what you heard, okay?
>
> "[CS]: Mr. Steinberg took his hand and . . . rapped her on the side of her face.
>
> "Q: You're indicating he took his right hand and he struck her with the back of his hand, is that right? . . .
>
> "[CS]: Right, just like smash, right.
>
> "[DEFENSE ATTORNEY]: Could we strike 'smash'? . . .
>
> "Q: Do you know what side of her face he struck?
>
> "[CS]: It would be the right side . . . the temple area, the forehead, just the side . . .
>
> "Q: Would you describe the degree of force with which Mr. Steinberg struck his daughter?
>
> "[CS]: It was pretty forceful. If I was to hit anyone here like he did, I'm sure a tear would come to her eye.

established that defendant had abused Lisa on previous occasions." (*Id.*) The reason the evidence points to Steinberg abusing and thus killing Lisa on that night is because the evidence established that he, not Hedda Nussbaum, abused her on prior occasions.

"[DEFENSE ATTORNEY]: I ask that be stricken. That's an opinion.

"COURT: I'll allow it. You may describe what you mean by 'pretty forceful.'

"[CS]: That I'd bring tears to your eyes or anybody here if I hit you as hard."

Thus, we find the dissent unpersuasive in asserting that "the jury's verdict did not reflect any necessary finding that [Steinberg] was responsible for assaulting or abusing Lisa on earlier occasions."[2] On the contrary, Steinberg's conviction means the jury found credible the testimony of witnesses who testified about Steinberg's abuse of Lisa prior to the night of the final blow. Consequently, we find that collateral estoppel properly dictated Justice Nardelli's decision awarding Launders partial summary judgment on liability.

Steinberg was not denied a full and fair opportunity to address the issue that he abused Lisa. It is Steinberg's burden to demonstrate the lack of such opportunity, and he fails to do so, particularly in the face of the fact that he was provided a lengthy trial during which he was represented by competent counsel, and that his CPL article 440 motion and appeal, the decision of which was 26 pages, were thoroughly considered.

The issue of prior abuse was, as noted, thoroughly explored at trial and Steinberg's defense attorneys made concerted but unsuccessful efforts to strike references to prior abuse in front of the jury as this excerpt from a sidebar conference during the People's summation illustrates:

"[DEFENSE ATTORNEY]: [the ADA] is mentioning instruments of, and he is commenting on instruments of abuse which it would seem to me have been taken out of the case by your indication . . . that you are not submitting the endangering counts to the jury.

"COURT: I did not eliminate the endangering count regarding Lisa Steinberg on the merits. Clearly the evidence was sufficient to sustain it. The evidence was admitted at trial.

---

2. The dissenting views appear to be that a defendant must have been both indicted and convicted of specific facts, which facts are the subject of estoppel in a subsequent action. No precedent stands for this proposition, nor do the dissenters cite to any relevant case law.

"[DEFENSE ATTORNEY]: It isn't clear to me why it should be commented on.

"COURT: Because you yourself brought it up . . . by saying that the homicide was as a result of child abuse by stressing that Hedda Nussbaum was responsible for that child abuse and by bringing in the fact that the witness alleged Hedda Nussbaum had struck the child . . .

"[DEFENSE ATTORNEY]: We did it on the credibility issue not substantive issue of abuse itself.

"COURT: Maybe I didn't hear your summation but I thought your argument was that Hedda Nussbaum killed the child."

Consequently, even if the actual charge of prior abuse was not in front of the jury as a charge standing on its own, the issue was most certainly "raised [and] litigated" in the criminal action. (*See Dier v City of New York*, 79 AD2d 596 [2d Dept 1980].)

Therefore, we affirm the award for compensatory damages of $5 million for the abuse suffered by Lisa prior to her death.

Steinberg further argues that the punitive damages assessed against him violate his constitutional right since "any award in excess of ten times actual damages presumptively violates his Eighth Amendment right." Steinberg appears to have based his calculation on the erroneous assumption that we would reduce the compensatory damages awards, if not vacate them. In light of our foregoing affirmance of the compensatory damages, the punitive damages award of $5 million dollars remains one third of the total damages awarded.

As the plaintiff asserts, punitive damages are appropriate in cases where the wrong complained of is "actuated by evil and reprehensible motives" (*see Walker v Sheldon*, 10 NY2d 401, 404 [1961]) and " '[w]here the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime.' " (*See Prozeralik v Capital Cities Communications*, 82 NY2d 466, 479 [1993], quoting Prosser and Keeton, Torts § 2, at 9 [5th ed 1984]; *Giblin v Murphy*, 73 NY2d 769, 772 [1988] [high threshold of moral culpability required].)

In urging this Court to affirm the punitive damages, the plaintiff appropriately describes Steinberg's conduct as a heinous and inexcusable assault upon a defenseless child. The

plaintiff states: "[T]he cavalier disregard of Lisa's welfare evidenced by [Steinberg's] failure to summon aid is exceeded only by the sadistic mechanism he employed to bring about the need for medical treatment in the first place." The heinous nature of Steinberg's intentional and deliberate abuse and manslaughter of a defenseless little girl earned him the cognomen "monster" almost 20 years ago. Now, the revisitation of the horror that was Lisa Steinberg's life continues to elicit a palpable sense of outrage. We therefore affirm the award for punitive damages.

We have considered the other issues raised by Steinberg on appeal, and have determined that they are also without merit. Steinberg's attempt to obtain a reduction in the award by contending that there was no evidence of pecuniary loss because Lisa had no duty to support anyone is untenable. As Justice Nardelli expressly observed in his October 1989 order, the fifth through seventh causes of action were not premised on wrongful death but rather were comprised of tort claims alleging breaches of duties to Lisa herself. These "survivor actions" do not necessitate a demonstration of pecuniary loss by Launders, the legal representative of Lisa's estate. (*See* EPTL 11-3.2 [b]; *Adelman v Adelman*, 191 Misc 2d 281, 287 [Sup Ct, Kings County 2002].)

■ Finally, Steinberg's assertion that the court erred in failing to determine the apportionment of fault and reduce the judgment against him by the pro rata share or the amount of the settlement, whichever was greater, is unavailing.

A nonsettling tortfeasor may be permitted to amend his or her answer to assert the defense of the plaintiff's release of a cotortfeasor, thereby reducing his or her liability by the equitable share of liability of the settling tortfeasor under General Obligations Law § 15-108 (a), where the plaintiff will not be prejudiced by the amendment. (*Whalen v Kawasaki Motors Corp., U.S.A.*, 242 AD2d 919 [4th Dept 1997], *affd in relevant part* 92 NY2d 288 [1998].)

Here, the court providently used its discretion in affording Steinberg the benefit of asserting a setoff from the $985,000 already provided to Launders, but declining to permit him to assert the apportionment defense, pursuant to CPLR article 16. Launders had already been awarded partial summary judgment on liability against Steinberg and therefore justifiably relied on the inference that she was obligated only to put forward evidence of damages. Under those circumstances, coupled with the lengthy interim between the acts complained of and the inquest,

Launders would be highly prejudiced if compelled to litigate the extent of the fault of the city defendants.

In any event, in light of the abundant evidence of serious criminal and abhorrent conduct, Steinberg would be hard pressed to demonstrate that his equitable share of the total liability is 50% or less in order to invoke CPLR article 16.

Accordingly, the judgment of the Supreme Court, New York County (Louis B. York, J.), entered June 10, 2004, which, after an inquest, awarded plaintiff Michele Launders, as administratrix of the estate of Baby Girl Launders, also know as Lisa, the sum of $10 million in compensatory damages (including $5 million for pain and suffering for eight hours, and $5 million for pain and suffering as a battered child) and $5 million in punitive damages, all with interest, should be affirmed, without costs.

ANDRIAS, J. (concurring in part and dissenting in part). While we are all in agreement that defendant-appellant perpetrated a heinous crime when he killed six-year-old Lisa, Justice McGuire is correct in finding, with regard to the inquest court's award of damages for pain and suffering, to the extent alleged in the fifth and sixth causes of action, resulting from injuries Lisa endured as a battered child, that plaintiff-respondent Michele Launders in her capacity as administratrix of Lisa's estate, has not met her burden of showing that appellant's liability for uncharged prior acts of abuse was "necessarily determined" in the earlier criminal prosecution against him.

The most serious crime for which appellant was charged was murder in the second degree, arising out of his striking of Lisa on the evening of November 1, 1987. The prosecution's theory for the lesser charge of manslaughter in the first degree was that appellant "with intent to cause serious physical injury to Lisa, injured her and then failed to obtain medical assistance for her, causing her death" (*People v Steinberg,* 170 AD2d 50, 62-63 [1991], *affd* 79 NY2d 673 [1992]). His conviction for that crime "necessarily determined" for collateral estoppel purposes that, on the night in question, appellant violently struck the child several times in the head and essentially left her to die. However, the same cannot be said for the earlier instances of abuse and neglect allowed by the trial court as background material and to counter any potential defense that appellant's act was an isolated incident or mere accident. Absent a conviction for such alleged abuse and neglect, appellant had no basis to ap-

peal the use of such evidence other than to question the propriety of its introduction at trial with regard to his manslaughter conviction. Indeed, as a criminal defendant in that earlier proceeding he was under no obligation to refute or contradict such testimony or, constitutionally, to mount any defense.

Accordingly, the grant of summary judgment on the fifth and sixth causes of action insofar as it imposed liability on defendant for the alleged injuries endured by Lisa as a battered child and the award of damages for her conscious pain and suffering resulting from such injuries should be reversed and vacated and the matter remanded for trial of both the issues of liability and damages.

Moreover, although the noted forensic pathologist Michael Baden testified at the inquest on damages that Lisa would not necessarily have lost consciousness immediately after appellant struck her in the head shortly after 6:00 P.M. on November 1, 1987 and was of the opinion that Lisa "lost consciousness 8 to 10 hours later," the sole basis for such opinion and the inquest court's finding that Lisa vomited throughout the night for a period of 8 to 10 hours before she became comatose between the hours of 4:00 and 6:00 A.M. were statements made by appellant and Hedda Nussbaum when Lisa was taken by ambulance to the pediatric emergency room at St. Vincent's Hospital. Subsequently, however, at the criminal trial, which is the only basis for the collateral estoppel sought to be applied here, Ms. Nussbaum, appearing as a witness for the prosecution, testified that those and similar statements made to the police were a "cover story" (170 AD2d at 60). Ms. Nussbaum, the sole eyewitness to the events of that evening, also testified at the criminal trial that Lisa was unconscious when appellant carried her limp body into the bathroom moments after 6:00 P.M. and laid her on the floor. Thus, although Dr. Baden's opinion was unrefuted at the inquest on damages, the underlying basis for his opinion is certainly questionable.

Where it is contended on appeal that an award of money damages is excessive, CPLR 5501 (c) requires this Court to determine whether such award "deviates materially from what would be reasonable compensation." Ordinarily, when dealing with an excessive jury verdict, we direct a new trial unless the plaintiff stipulates to accept a lower amount. Where, however, as here, an excessive verdict is rendered by the court after a bench trial, such procedure is not required and this Court may

render the judgment it finds warranted by the facts (*Northern Westchester Professional Park Assoc. v Town of Bedford,* 60 NY2d 492, 499 [1983]). Thus, notwithstanding the inherent difficulty and subjectivity involved, once liability has been determined we, in our oversight role as gatekeepers, must dispassionately review the damages awarded and, in the case of an excessive verdict, reduce such award to an amount we deem to be reasonable.

Although at this point nothing, let alone a sum of money, can bring Lisa back or relieve her suffering, we nevertheless must determine what would be just compensation for her injuries. Neither plaintiff nor the other members of this Court point to a truly comparable award in this or any other state to guide and enlighten us, and reliance upon case precedent alone is virtually impossible, given the different injuries and circumstances in each case (*see Po Yee So v Wing Tat Realty,* 259 AD2d 373, 374 [1999]). Nevertheless, although no one can measure another person's pain and we can only imagine the extent of Lisa's suffering, assuming that Lisa was conscious from shortly after 6:00 P.M. until she was brought to the hospital the next morning and taking into consideration the "tormented" hours before her death, the award of $5 million for past pain and suffering deviates materially from what would be reasonable compensation under these circumstances and should be reduced to $2 million, which amount should be subject to the setoff previously ordered by the inquest court of the amount settled for with the municipal defendants.

Finally, given the foregoing award of compensatory damages, appellant's total lack of remorse, and the heinous nature of his assault and battery and negligence, which are the sole remaining causes of action under consideration on this appeal, an additional award of $2 million in punitive damages is appropriate and the verdict should be reduced accordingly.

McGuire, J. (concurring in part and dissenting in part). I respectfully disagree with the majority in three respects. First, the October 10, 1989 order awarding summary judgment against appellant on the fifth, sixth and seventh causes of action on the basis of collateral estoppel was erroneous in part. That is, although appellant's earlier criminal conviction for manslaughter in the first degree conclusively established that appellant had caused the death of Lisa Steinberg by acts of commission and omission on November 1 and 2, 1987, the jury's verdict did not reflect any necessary finding that appellant was responsible for

assaulting or abusing Lisa on earlier occasions. The prosecution offered evidence at appellant's criminal trial that he had abused Lisa on earlier occasions and it well may be that the jury credited the testimony relating to those acts of abuse. But as is clear from the record on appellant's appeal from the judgment of conviction (*People v Steinberg*, 170 AD2d 50 [1991], *affd* 79 NY2d 673 [1992])—in particular, the trial court's charge to the jury—appellant was not charged with those prior acts of abuse and thus the jury could not possibly have found that he committed them. Respondent did not meet and could not have met her burden of showing that appellant's liability for those acts of abuse was "necessarily determined" in the earlier action (*see Ryan v New York Tel. Co.*, 62 NY2d 494, 500-501 [1984]; *see also D'Arata v New York Cent. Mut. Fire Ins. Co.*, 76 NY2d 659, 667 [1990] ["Generally, for a question to have been actually litigated so as to satisfy the identity requirement, it must have been properly raised by the pleadings or otherwise placed in issue and actually determined in the prior proceeding" (internal quotation marks and citations omitted)]). Accordingly, the award of summary judgment was erroneous to this extent, the award of $5 million for Lisa's pain and suffering as a battered child should be vacated, and plaintiff's claims based on defendant's conduct prior to November 1, 1987 should be remanded for further proceedings on the issue of liability.

The majority appears to be of the view that because the jury necessarily determined that appellant had committed the acts of abuse on November 1 and 2, 1987 that caused Lisa's death, the jury necessarily also found that appellant had committed prior acts of abuse. The latter finding, of course, does not follow from the former finding. The majority, moreover, does not dispute that the jury in appellant's criminal trial was not asked to determine whether appellant committed the prior acts of abuse. Rather, the late Judge Rothwax instructed the jury that in order to find appellant guilty of the manslaughter charge it was required to find beyond a reasonable doubt that on or about November 2, 1987, by acts of commission and omission, appellant caused Lisa's death. The jury was never instructed that it was required to find, before convicting appellant of the manslaughter charge, that appellant had committed the prior acts of abuse. For this basic reason, appellant should not have been collaterally estopped from contesting his liability for the prior acts of abuse (*Buechel v Bain*, 97 NY2d 295, 303-304 [2001], *cert denied* 535 US 1096 [2002]).

Indisputably—and respondent certainly never contended otherwise in her motion for summary judgment on collateral

estoppel grounds—the criminal jury was not asked to determine whether appellant committed the prior acts of abuse and was not instructed that it could find appellant guilty of the manslaughter charge only if it found he had committed the prior acts of abuse. Accordingly, it is indisputable that in convicting appellant of the manslaughter charge the jury (or some jurors) could have entertained a reasonable doubt about whether he had committed the prior acts of abuse. Indeed, it also is indisputable that the jury (or some jurors) could have come to any one of a number of conclusions—or could have reached no conclusion at all—about whether appellant had committed the prior acts of abuse. Only if the word "necessarily" is redefined to mean "probably" can it be said that the criminal trial "necessarily determined" that appellant committed the prior acts of abuse.

Another flaw in the majority's approach is apparent when its application to future cases is considered. Whenever evidence of an uncharged crime is received in a criminal case the jury may or may not find it persuasive. But in the absence of special verdicts, which are "generally disfavored in criminal trials" (*People v Ribowsky*, 77 NY2d 284, 290 [1991]), there is no way of knowing with anything approaching reasonable certainty whether the jury credited that evidence or concluded (beyond a reasonable doubt or by a less exacting standard) that the defendant committed the uncharged act or acts. Presumably, the majority would not conclude that whenever the jury returns a guilty verdict the defendant is collaterally estopped from litigating the issue of whether he committed the uncharged act or acts. The majority, however, does not provide any guidance on the critical question of when the defendant will be collaterally estopped, except to the extent that its opinion suggests that the question turns on ad hoc evaluations by the courts in the subsequent civil proceedings of the strength of the uncharged-crimes evidence. To the extent such evaluations are meant to be decisive, the majority thus invites future litigation about the strength of the uncharged-crimes evidence. In other words, whether a party is estopped in a subsequent proceeding from relitigating an issue turns on that party's ability to relitigate that very issue.[1]

Contrary to the majority's writing, nothing in Justice Sullivan's opinion for this Court affirming appellant's conviction

---

1. Curiously, the majority asserts without explanation that "[t]he dissenting [*sic*] views appear to be that a defendant must have been both indicted and convicted of specific facts, which facts are the subject of estoppel in a

suggests that this Court believed—let alone gratuitously concluded—that the jury had decided that appellant had committed the uncharged acts of abuse in convicting appellant of manslaughter. To be sure, the Court stated that "[t]he evidence established that [appellant] had abused Lisa on previous occasions" (170 AD2d at 66). This appraisal of the strength of the evidence of prior acts of abuse, however, was not essential to the Court's resolution of the appeal and, in any event, cannot ground the majority's collateral estoppel holding. No matter how powerful that evidence was, the jury was not asked to determine whether appellant committed the prior acts of abuse.

The majority is correct in stating that the issue of appellant's responsibility for the prior acts of abuse "was most certainly 'raised [and] litigated' in the criminal action." Solely on that basis, however, appellant could not properly be precluded in the civil proceedings from contesting his liability for those acts. Rather, appellant was free to contest his liability unless he had a full and fair opportunity to contest the issue of his liability for those acts in the criminal proceedings and that issue "necessarily [was] decided in the prior action" (*Buechel v Bain,* 97 NY2d at 303-304).

I also disagree with the majority's determination to uphold the award of $5 million for the pain and suffering Lisa endured in the 8 to 10 hours before she lost consciousness from the blow or blows inflicted by appellant. In reviewing this award of compensatory damages, it is important to bear in mind that the outrageousness of appellant's conduct is not a relevant factor. As the United States Supreme Court has stated:

> "Although compensatory damages and punitive damages are typically awarded at the same time by the same decisionmaker, they serve distinct purposes. The former are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct. *See* Restatement (Second) of Torts § 903, pp. 453-454 (1979); *Pacific Mut. Life Ins. Co. v Haslip,* 499 U.S. 1, 54 (1991) (O'CONNOR, J., dissenting). The latter,

---

subsequent action." Why the majority believes that Justice Andrias and I appear to have embraced this proposition is puzzling. In any event, I need not and do not opine on the question of whether there are any circumstances under which a criminal action might necessarily determine the issue of whether a defendant committed certain acts that the defendant neither was charged with nor convicted of committing.

which have been described as 'quasi-criminal,' *id.*, at 19, operate as 'private fines' intended to punish the defendant and to deter future wrongdoing. A jury's assessment of the extent of a plaintiff's injury is essentially a factual determination, whereas its imposition of punitive damages is an expression of its moral condemnation" (*Cooper Industries, Inc. v Leatherman Tool Group, Inc.*, 532 US 424, 432 [2001].)

Accordingly, in determining the amount of damages to award a plaintiff for past pain and suffering, the only relevant inquiry is what amount is necessary to "justly and fairly compensate" plaintiff (*Tate v Colabello*, 58 NY2d 84, 88 [1983]), irrespective of the nature of the causal factor in the infliction of the pain and suffering.

As plaintiff's expert testified, Lisa unquestionably would have suffered "severe headache," with pain of increasing severity, during the 8-to-10-hour period. Moreover, she would have been "very uncomfortable" as a result of vomiting and a feeling at some point of being unable to catch her breath. Nonetheless, neither plaintiff nor the majority has cited any precedent in which a comparable award has been upheld. While "personal injury awards, especially those for pain and suffering, are subjective opinions which are formulated without the availability, or guidance, of precise mathematical quantification" (*Reed v City of New York*, 304 AD2d 1, 7 [2003], *lv denied* 100 NY2d 503 [2003]), we are obligated "to determine what awards have been previously approved on appellate review and decide whether the instant award falls within those boundaries" (*Donlon v City of New York*, 284 AD2d 13, 18 [2001]). Although a multi-million dollar award undoubtedly is warranted, the award before us does not fall within the boundaries set by case law (*see Ramirez v City of New York*, 279 AD2d 563 [2001]; *Regis v City of New York*, 269 AD2d 515 [2000]; *Siler v 146 Montague Assoc.*, 228 AD2d 33 [1997], *appeal dismissed* 90 NY2d 927 [1997]; *Julmis v City of New York*, 194 AD2d 522 [1993]; *Gonzalez v New York City Hous. Auth.*, 161 AD2d 358 [1990], *affd* 77 NY2d 663 [1991]; *DeLong v County of Erie*, 89 AD2d 376 [1982], *affd* 60 NY2d 296 [1983]; *cf. Ramlakhan v Mangru*, 253 AD2d 806 [1998]).[2]

---

**2.** Contrary to the majority's suggestion, in each of these cases compensatory damages were awarded for intentionally inflicted injuries. That the

Finally, although I also would uphold a multi-million dollar punitive damages award, the erroneous collateral estoppel determination requires vacatur of the punitive damages award. When reviewing an award for punitive damages, a court must consider, among other things, the degree of reprehensibility of defendant's conduct (*BMW of North America, Inc. v Gore*, 517 US 559, 575 [1996] ["the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct"]). The degree of reprehensibility turns on several factors, including whether the tortious conduct involved repeated actions or was an isolated incident (*see State Farm Mut. Automobile Ins. Co. v Campbell*, 538 US 408, 419 [2003]). Since the award of punitive damages is based to some unascertainable extent on the erroneous determination that defendant was collaterally estopped from contesting his liability for the prior acts of abuse, meaningful review of the award is not possible. Accordingly, I would vacate the award of punitive damages and remand for further proceedings on the issues of liability and damages.

MAZZARELLI, J.P., and SAXE, J., concur with CATTERSON, J.; ANDRIAS and McGUIRE, JJ., each concur in part and dissent in part in separate opinions.

Judgment, Supreme Court, New York County, entered June 10, 2004, affirmed, without costs.

---

injuries causing Lisa's death were inflicted by her father and not a stranger is without question relevant to the award of punitive damages (*Cooper Industries, Inc.*, 532 US at 432 [a jury's "imposition of punitive damages is an expression of its moral condemnation"]). The relevance of that outrage to the award of compensatory damages, however, is far less clear. Whatever its relevance, I cannot agree with the majority that it is sufficient to relieve this Court of its obligation to "determine what awards have been previously approved on appellate review and decide whether the instant award falls within those boundaries" (*Donlon*, 284 AD2d at 18). Moreover, the award appears to exceed the highest awards sustained by appellate courts in recent years for past pain and suffering (*see e.g. Matter of New York Asbestos Litig.*, 28 AD3d 255 [2006] [$3 million]; *Ruby v Budget Rent A Car Corp.*, 23 AD3d 257 [2005] [$2 million], *lv denied* 6 NY3d 712 [2006]; *Cruz v Long Is. R.R. Co.*, 22 AD3d 451 [2005] [$3 million], *lv denied* 6 NY3d 703 [2006]; *Hotaling v CSX Transp.*, 5 AD3d 964 [2004] [$4 million]; *Weigl v Quincy Specialties Co.*, 1 AD3d 132 [2003] [$4 million (as reduced by trial court [*see* 190 Misc 2d 1 (2001)])]; *Reed v City of New York, supra* [$2.5 million]; *Mundy v New York City Tr. Auth.*, 299 AD2d 243 [2002], *lv denied* 100 NY2d 509 [2003] [$3 million]).